

**U.S. Department of Justice**

*Joshua S. Levy*
*Acting United States Attorney*
*District of Massachusetts*

---

*Main Reception: (413) 785-0235*

*United States Courthouse*
*300 State Street, Suite 230*
*Springfield, Massachusetts 01105*

April 10, 2023

BY E-MAIL: jlawson@princelobel.com

James Lawson, Esq.
Prince Lobel
One International Place, Suite 3700
Boston, MA 02110

Re:   *United States v. Antonio M. Strong, et al.*, 20-CR-30033-MGM
      *United States v. Herbert Wright III*, 21-CR-30031-MGM

Dear Counsel:

The United States Attorney for the District of Massachusetts (the "U.S. Attorney") and the U.S. Department of Justice's Criminal Division, Fraud Section (collectively, the "U.S. Department of Justice") and your client, Herbert Wright III ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

1.    <u>Change of Plea</u>

No later than April 24, 2023 or as soon as is practicable for the Court, Defendant will:

    a.   Plead guilty to Count One of the Indictment in *United States v. Antonio M. Strong, et al.*, 20-CR-30033-MGM: Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349. Defendant admits that Defendant committed the crime specified in this count and is in fact guilty of it.

    b.   Waive indictment and plead guilty to Count One of the Information in *United States v. Herbert Wright III*, 21-CR-30031-MGM: False Statements, in violation of 18 U.S.C. §1001(a)(2). Defendant admits that Defendant committed the crime specified in this count and is in fact guilty of it.

1

The U.S. Department of Justice agrees to dismiss the remaining Counts of the Indictment in *United States v. Antonio M. Strong, et al.*, 20-CR-30033-MGM that charge Defendant with Aggravated Identity Theft (Counts Eight and Twelve) following Defendant's sentencing.

Defendant agrees that the attached Statement of Facts is true and accurate.

2.      Penalties

Defendant faces the following maximum penalties:

> a.   *United States v. Antonio M. Strong, et al.*, 20-CR-30033-MGM - Count One (18 U.S.C. § 1349):  incarceration for twenty years; supervised release for three years; a fine of $250,000; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Indictment.

> b.   *United States v. Herbert Wright III*, 21-CR-30031-MGM - Count One (18 U.S.C. §1001(a)(2)):  incarceration for five years; supervised release for three years; a fine of $250,000; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

Defendant understands that, if Defendant is not a United States citizen by birth, pleading guilty may affect Defendant's immigration status. Defendant agrees to plead guilty regardless of any potential immigration consequences, even if Defendant's plea results in being automatically removed from the United States.

3.      Sentencing Guidelines

The U.S. Department of Justice agrees, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 13:

> a)   Defendant's base offense level is 7 because the offense of conviction in *United States v. Antonio M. Strong, et al., 20-CR-30033-MGM* has a statutory maximum term of conviction of 20 years or more (USSG §2B1.1(a)(1));

> b)   Defendant's offense level is increased by 8, because Defendant's loss involved between $95,000 and $150,000 (USSG §2B1.1(b)(1)(E)); and

> c)   Defendant's count of conviction in *United States v. Herbert Wright III*, 21-CR-30031-MGM groups together with his count of conviction in *United States v. Antonio M. Strong, et al., 20-CR-30033-MGM* because Defendant's false statements did not materially obstruct or impede the administration of justice with respect to the investigation (USSG § 3D1.2(d)); and

> d)   Defendant's offense level is decreased by 2, because Defendant has accepted responsibility for Defendant's crimes and his offense level prior to the operation

of subsection (a) is not 16 or greater (USSG § 3E1.1(a)).

Defendant agrees with the U.S. Department of Justice's Guidelines calculation, but reserves the right to argue that Defendant's offense level should be reduced by 2 on the basis that he was a minor participant in the criminal activity (USSG § 3B1.2(b)).

Defendant reserves the right to argue for a below-Guidelines sentence, including a term of probation.

Defendant understands that the Court is not required to follow this calculation or even to sentence Defendant within the Guidelines and that Defendant may not withdraw Defendant's guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the U.S. Department of Justice will object to any reduction in Defendant's sentence based on acceptance of responsibility if: (a) at sentencing, Defendant (directly or through counsel) indicates that Defendant does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crimes to which Defendant is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category is reduced, the U.S. Department of Justice reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Department of Justice's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.    Sentence Recommendation

The U.S. Department of Justice agrees to recommend the following sentence to the Court:

    a)  incarceration within the Guidelines sentencing range as calculated by the U.S. Department of Justice;

    b)  a fine within the Guidelines sentencing range as calculated by the U.S. Department of Justice, unless the Court finds that Defendant is not able, and is not likely to become able, to pay a fine;

    c)  36 months of supervised release;

    d)  a mandatory special assessment of $200, which Defendant must pay to the Clerk of the Court by the date of sentencing;

    e) restitution of $139,878; and

    f) forfeiture as set forth in Paragraph 7.

Restitution is payable as follows:
| | | |
|---|---|---|
| a) | $24,730 to Planemasters, Ltd.; | |
| b) | $20,679 to Aircraft Service Group, Inc.; | |
| c) | $15,015 to Epic Jet, LLC; | |
| d) | $19,760 to Jet Partners Worldwide, Inc.; | |
| e) | $14,549 to World Travel Holdings Co.; | |
| f) | $34,025 to Dream Squad, LLC; | |
| g) | $10,458 to Woof Woof Puppies; and | |
| h) | $752 to Airport Car and Limousine Service. | |

5.     <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge Defendant's conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

    a) Defendant will not challenge Defendant's <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

    b) Defendant will not challenge any prison sentence of 18 months or less or any court orders relating to forfeiture, restitution, fines or supervised release. This provision is binding even if the Court's Guidelines analysis is different than the one in this Agreement.

The U.S. Department of Justice agrees that, regardless of how the Court calculates Defendant's sentence, the U.S. Department of Justice will not appeal any sentence of imprisonment of 12 months or more.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence (to the extent set forth in subparagraph (b), above) will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence (to the extent set forth in subparagraph (b), above), regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.</u>

Defendant is agreeing to give up these rights at least partly in exchange for concessions the U.S. Department of Justice is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

6.    Waiver of Hyde Amendment Claim

Defendant is aware that the Court can award attorneys' fees and other litigation expenses to defendants in certain criminal cases. In exchange for the concessions the U.S. Department of Justice is making in this Agreement, Defendant waives any claim under the so-called "Hyde Amendment," 18 U.S.C. §3006A, that is based in whole or in part on the U.S. Department of Justice's agreement in Paragraph 1 to dismiss Counts Eight and Twelve in *United States v. Antonio M. Strong, et al.*, 20-CR-30033-MGM.

7.    Forfeiture

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following: $139,878 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that $139,878 is subject to forfeiture on the grounds that it is equal to the amount of proceeds the defendant derived from the offense and the amount of money involved in Defendant's offense.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a)

regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney. Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the United States Attorney's Office.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

8.    Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

9.    Breach of Plea Agreement

Defendant understands that if Defendant breaches any provision of this Agreement, violates any condition of Defendant's pre-trial release or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to withdraw Defendant's guilty plea. Defendant's conduct, however, would give the U.S. Department of Justice the right to be released from the U.S. Department of Justice's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the U.S. Department of Justice during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy

Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

    10.    <u>Who is Bound by Plea Agreement</u>

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts and the U.S. Department of Justice's Criminal Division, Fraud Section. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

    11.    <u>Modifications to Plea Agreement</u>

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

*     *     *

If this letter accurately reflects the agreement between the U.S. Department of Justice and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Steven H. Breslow.

Sincerely,

JOSHUA S. LEVY
Acting United States Attorney

By: _____

DEEPIKA BAINS SHUKLA
Chief, Springfield Branch Office

_____

STEVEN H. BRESLOW
Assistant U.S. Attorney

GLENN S. LEON
Chief, U.S. Department of Justice
Criminal Division, Fraud Section

_____

ANDREW R. TYLER
Trial Attorney

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts and the U.S. Department of Justice's Criminal Division, Fraud Section (the "U.S. Department of Justice"). There are no unwritten agreements between me and the U.S. Department of Justice, and no U.S. Department of Justice official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crimes I am pleading guilty to, and the maximum penalties for those crimes. I have discussed the Sentencing Guidelines with my lawyer, and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me, and we have had enough time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offenses. I believe this Agreement is in my best interest.

Herbert Wright III
Defendant

Date:   6/5/23

I certify that Herbert Wright III has read this Agreement and that we have discussed what it means. I believe Herbert Wright III understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Department of Justice has not extended any other offers regarding a change of plea in this case.

James Lawson, Esq.
Attorney for Defendant

Date:   June 5, 2023

**Statement of Facts**

*United States v. Antonio M. Strong, et al.*
20-CR-30033-MGM

*United States v. Herbert Wright III*
21-CR-30031-MGM

## Overview

1.      Between at least March 9, 2017 through and including November 24, 2018, the defendant Herbert Wright III ("Wright") conspired with Antonio M. Strong ("Strong") and others to defraud businesses and individuals by possessing, using, and transferring unauthorized and stolen payment card account information (the "illicit account information") to obtain valuable goods and services.  During this time, Strong was a music promoter and Wright was a rap artist known as "Lil Herb," "Herb," and "G Herbo," and each were based in the area around Chicago, IL.

2.      The illicit account information included the actual cardholders' names, addresses, payment card account numbers, security codes, and account expiration dates.  Strong and his co-conspirators referred to the illicit account information as "moves."

3.      To perpetrate the fraud with Wright and others, Strong used various telephone numbers, e-mail accounts with fictitious names and companies, and aliases such as "BH," "Walter O'Malley," and "Darren Geiger."  BH is a real person and resident of the Chicago area who never authorized, or even knew about, the transactions in his name that are set forth herein.  Walter O'Malley and Darren Geiger are fictitious identities.

4.      Generally, because Strong and his co-conspirators provided authentic payment card information, the defrauded businesses and individuals successfully processed their transactions and provided the goods and services. The actual cardholders discovered these transactions on their

accounts and disputed the charges. The actual cardholders' payment card companies then reversed their payments and charged back the transactions to the businesses and individuals, which consequently suffered losses in the amounts of the unauthorized transactions.

5.    The goods and services that Strong fraudulently obtained for Wright included:

a.    four private jet charters (two of which listed Wright under an alias, "Herbert Light");

b.    exotic car rentals (for which Strong informed Wright that he was using the "Darren" alias); and

c.    a luxury villa in Jamaica (for which Wright requested that Strong provide vehicles and an additional credit card account for his incidentals).

6.    Wright used the proceeds of these frauds to travel to various concert venues and to advance his career by posting photographs and/or videos of himself on the private jets, in the exotic cars, and at the Jamaican villa. In addition, Wright helped Strong obtain designer puppies from a business by falsely representing to the business that Wright was the actual purchaser of the puppies and by concealing Strong's actual identity from the business.

7.    During the communications between Wright and Strong, Wright, among other things: (a) acknowledged that it did not cost Strong anything to rent a vehicle for Wright; and (b) Strong sent Wright a screen shot of Strong's account balance on a dark web site that sold credit card account information as proof that Strong did not have the funds to purchase more illicit account information for Wright. However, the Government's investigation did not discover any evidence that Wright transferred or sold illicit account information to any other person or that Wright purchased illicit account information from any dark web site.

8.      Lastly, on November 24, 2018, when a Special Agent of the United States Secret Service interviewed Wright concerning the frauds and his relationship with Strong, Wright falsely stated:

        a.      he never provided Strong any money;

        b.      he never received any thing of value from Strong; and

        c.      he had no direct relationship with Strong.

9.      However, these false statements did not materially obstruct the investigation or prosecution of the charged offenses.

10.     The communications and transactions set forth below were obtained pursuant to: (1) search warrants executed on (a) various e-mail accounts and social media accounts belonging to Strong, Wright, and others and (b) an iPhone seized from Strong on December 28, 2017 (the "Strong iPhone") during a law enforcement operation; and (2) records and information from various businesses, individuals, and financial institutions.

11.     The Strong iPhone contained hundreds of communications with Wright and listed several telephone numbers for Wright, including:

        a.      Herbo:  (xxx) xxx-0122 (the "Wright x-0122 Phone") and (xxx) xxx-7451 (the "Wright x-7451 Phone")

        b.      G Herbo:  (xxx) xxx-6240 (the "Wright x-6240 Phone").

**Wright's 2016 Requests To Strong For Various Services**

12.     Starting in at least 2016, Wright frequently communicated with Strong through text messages, voice calls, and Instagram direct messages ("DMs") between their two accounts (*nolimitherbo* and *gbe_antonio*).  As early as 2016, Wright requested that Strong provide him with things of value, such as hotel accommodations and a flight.

13.     On May 21, 2016, Strong sent Wright DMs that stated "My IMessage or FaceTime don't work regular call or text" and provided his number as (xxx) xxx-5366 (the "Strong x-5366 Phone").

14.     On July 30, 2016, Wright and Strong engaged in the following DM exchange:

Wright:  "Aye what up I need a hotel room."

Strong:  "Wya ["where you at"] church."

Wright:  "I'm in the Raq [slang for Chicago] See if you could get me sum for tonight like to check in when I leave my show tonight."

*** ***
Wright: "Finesse [a slang term that means to obtain by manipulation or theft] me a room or sum dude get us a crib while we out here or sum bro.  In Chicago."

Strong:  "Ok."

15.     On September 11, 2016, Wright and Strong engaged in the following DM exchange:

Wright:  "Aye boa I need a flight.  Right now doe for tonight you owe me 1."

Strong:  "Ok.  Name.  Bday.  Email.  An where to from where."

**The Private Jet Charter Frauds**

16.     On February 28, 2017, Wright and Strong engaged in the following DM exchange:

Strong:  "What's the new number"

Wright:  "(xxx) xxx-9564 (the "Wright x-9564 Phone") hit me"

17.     As set forth below, between March 9 – 17, 2017, Strong used (xxx) xxx-1625 (the "Strong x-1625 Phone") and illicit credit card account information to obtain private jet charters for Wright (who was either listed in his own name or under the alias "Herbert Light") and Wright's associates from the following companies:  Planemasters, Ltd. ("Planemasters"), Aircraft Services

Group, Inc. ("ASG"),  Epic Jet, LLC ("Epic Jet"), and Jet Partners Worldwide, Inc. ("Jet Partners").

18.    Between December 31, 2016 and March 23, 2017, the Strong x-1625 Phone had the following contacts with phones used by Wright:

      a.    Wright x-0122 Phone:  31 contacts.

      b.    Wright x-9564 Phone:  17 contacts.

      c.    Wright x-6240 Phone:  1 contact (on March 23, 2017).

<u>The Planemasters Fraud</u>

19.    On March 9, 2017, Wright engaged in the following DMs with Strong and an unindicted co-conspirator, ("UCC-1"):

> <u>Wright to Strong</u>: "Call me bro what be to you??  Like why I'm still waiting on flight Info bro after you stand on top of everything else?? You must be sleep off the drank [slang for a highly intoxicating drink made with codeine or cough syrup] or sum man lol wake up yo BIG HEAD ASS UP frankin stein."

> <u>Wright to UCC-1</u>:  "Aye Tell Antonio hit the line bro asap he tweaking."

> <u>UCC-1 to Wright</u>:  "I just told him u talked to him gang?"

> <u>Wright to UCC-1</u>:  "Yeah I holla @his slow ass we Finna [slang for "going to."] link wit y'all doe."

20.    Also on March 9, 2017, Strong used the fictitious name "Richard O'Malley," the phone number (xxx) xxx-1625 (the "Strong x-1625 Phone"), and the e-mail address <u>omalleyauto@gmail.com</u> to book a flight with Planemasters from Chicago to Miami for nine passengers:  Wright's companion AF, Wright's bodyguard QH, and Wright's associates, AC, AA, AB, GD, SD, and GJ.  Wright, AF, AC, GD, and GJ all posted on their social media accounts various photographs of themselves and/or other passengers either inside or outside the private jet.



21.     "O'Malley" provided MasterCard account x-2663 in the name of BA (purportedly an account representative with Epic Music) to charge $24,730 for the flight, but the transaction was later charged back to Planemasters as fraudulent.

The ASG Fraud

22.     On March 14, 2017, Strong used the name "BH," the Strong x-1625 Phone, and the e-mail address globalsociety@gmail.com to book a flight with ASG from Tampa to Chicago. "BH" stated he was from Sony Music and needed the flight for some performers, and he also provided telephone number (xxx) xxx-1053 for GD, whom "BH" said was the road manager and would be the contact for the flight. GD sent texts from this number to ASG providing the passenger details for the flight:  Wright (listed as "Herbert Light" with the same birthdate as Wright), Wright's companion AF, and Wright's associates AC, AB, GJ, and JH. Wright, GJ, and JH posted photographs and videos from the private jet, and Wright used footage from the cabin of the jet depicting himself, AC, and AF in the music video for his song "*Yerkys*."

23.     "BH" provided ASG with an electronically signed contract for the flight and an electronically signed credit card authorization form in the name of "BH" with MasterCard account x-5202 for $20,679, but the entire amount was charged back as fraudulent after the actual account holder, LD, disputed the charge.

The Epic Jet Fraud

24.     On March 15, 2017, Strong used the name "BH" purportedly of Epic Music, the Strong x-1625 Phone and the e-mail address globalsociety2017@gmail.com to book a flight with Epic Jet from Chicago to Austin, TX.

25.     On March 16, "BH" texted a passenger list that included Wright (listed under the alias "Herbert Light" with Wright's date of birth), Wright's companion AF, Wright's bodyguard

QH, Wright's personal assistant VM, and Wright's associates AC, AB, and TM. "BH" also provided a scanned copy of his driver's license, an electronically signed contract in the amount of $14,300 for the Chicago to Austin flight, along with an electronically signed credit card authorization for MasterCard account x-8938 in the name of PS, purportedly of Epic Music. Epic Jet repeatedly attempted to charge the account for this flight ($15,015, including a 5% fee), but the transactions declined. Epic Jet attempted to obtain another account number from "BH," but "BH" never provided one.

The Jet Partners Fraud

26.     On or about March 17, 2017, Strong used the name "BH," the Strong x-1625 Phone, and the e-mail address globalsociety2017@gmail.com to book a flight from Austin, TX to St. Paul, MN. "BH" texted ASG a list of the passengers: Wright (listed again under the alias "Herbert Light") TM, AF, QH, AF, QH, VM, AC, and AB. Jet Partners provided a Hawker 1000 aircraft with Tail Number N524LR for this flight. AC posted on his Instagram account a photograph of himself descending from the jet, and VM similarly posted on his Facebook account a photograph of himself, QH, and Wright standing in front of the jet.

27.     "BH" also electronically signed a contract and credit card authorization for a Hawker 1000 flight from Austin, TX to St. Paul, MN. The credit card authorization form listed One World Music, Inc. with MasterCard account x-5938 at an address in Westwood, MA, for a total of $19,000, and the transaction ($19,760 with the card fee) was later charged back as fraudulent after the actual cardholder, BM, disputed the charge.

28.     One day later, on March 18, 2017, Strong sent Wright the following DMs: "Call me. ASAP. 8156181625." As set forth above, Wright's various phones had numerous contacts with the Strong x-1625 Phone.

## Wright's Further Requests to Strong for Goods and Services

29.     In addition, Strong and Wright also communicated through voice calls and through Instagram DMs.  In these communications, Wright frequently asked Strong for goods or services, such as flights, vehicles (*i.e.* "whips"), or accommodation (*i.e.*, "cribs."), which Strong often procured by fraud.

30.     On April 23, 2017, Wright engaged in the following DMs with Strong:

Wright:  "I need that Bentley truck asap!!"

Strong:  "Way nigha"

31.     On May 19, 2017, Wright engaged in the following DMs with Strong:

Wright:  "Get me a whip inna A [Atlanta]."

Strong:  "OK give me a second where you staying?"

Wright:  "Buckhead"

32.     On May 23, 2017, Wright engaged in the following DMs with Strong:

Wright:  "Where my bent truck lol"

Strong:  "FT [FaceTime] me"

33.     In spite of Wright's frequent dealings with Strong, as set forth below, when Special Agent Tyler Martin of the United States Secret Service interviewed Wright on November 24, 2018, Wright falsely stated he never paid Strong or received any thing of value from him.

## Strong's Fraudulent Procurement of a Jamaican Villa for Wright

34.     On June 8, 2017, Wright sent Strong DMs that said "Hml ["hit my line" – *i.e.*, call me] asap xxx xxx xxx" (the "Wright x-6240 Phone") and then sent an image of a six-bedroom villa in Jamaica.  That same day, the Wright x-6240 Phone had two contacts with (xxx) xxx-8253

(the "Strong x-8253 Phone"), which Strong told Wright was his phone in the following DM exchange.

35.    On June 12 - 14, 2017, Wright had the following DM exchange with Strong:

Wright: "Ima send you some bread [slang for money].  I need you to get this."

Strong: "OK.  Whe[r]e are u."

Wright: "I'm in Chicago now. I was telling you hit me . . I need that for Jamaica doe."

Wright: "Official shit doe big bro nbs.  You could do that?"

Strong: "Yea.  Whe[n] you going"

Wright: "July 7-11th.  Wyo bro?  Is you gone be able to do it or naw"

Strong: "Bro wassup wi all this dm shit.  Hit my phone.  U need some done ASAP hit me gang.  [the Strong x-8253 Phone]"

36.    On June 20, 2017, Strong sent a DM to Wright that stated:  "This Antonio this my new number delete every old number u have of mines save this only!"

37.    From June 20, 2017 until July 10, 2017, Wright continued to exchange DMs with Strong to request accommodations, vehicles, and a credit card in Jamaica.  For example:

a.    On June 26, 2017:

i.    Wright: Aye Tonio on Vito hit me today bro!! Fr you Cappin It Off big bro... I'm going to another country bro!! Not LA this shit can't be last minute or flukey bro!!! I'm finna be in Jamaica I can't just book no hotel room if you tweak bro! On Vito I sent you my money the first day bro stop acting like I ain't supposed to be mad yo ass playing & im not talking to you bro.



\*\*\* \*\*\*

 ii. <u>Wright</u>:  Bro I'm leaving on the 7th I need my shit booked today dude!! Not 2ma next week nun of that shit Tonio bro on Vito I fuck wit you time and time again after you tweak with everybody else bro I still fuck wit you so why is you tweaking dude.  I'm disappointed in you big bro... make me feel good bro cuz you trippin

 iii. <u>Strong</u>:  Shut up let me do it now man.  Had to wait a lil days closer bro.

 iv. Wright:  Right on Vito I know you official like a whistle you just like not hitting a mf going missing.  Cmon bro reserve that big ass crib & some whips for me big bro!! On Vito I'll pay you again & ima do the verse bitch just lace me that whole Lil week!

b. On June 30, 2017, <u>Wright</u>:  Send me my crib Bitch!

c. On July 6, 2017:

<u>Wright</u>:  Book my shit bro ASAP today right now or in the morning first thing sum bro!! On Vito I ain't calling you blowing you up for my shit bro.

<u>Strong</u>:  What nigga I been sleep.  U tripping gang. I got u today homie.

<u>Wright</u>:  How am I tripping bro & I leave at 5am you can go to sleep again anything can happen bro.  Just book it 4 it get too late.  Get them whips too!

d. July 9 to 10, 2017 (while Wright was in Jamaica):

<u>Strong</u>: How's everything?  U good out there?

<u>Wright</u>:  Yeah big bro I'm tryna find my other phone. My shit tweaking. Are you gone put a card on file for me lol.  Incidentals.

<u>Strong</u>:  What.  Call me.  Nbs.

***

> <u>Wright:</u> You aint call me you posed to got the whips on deck everything . . . I need you to call that front desk & email them the new card info dude they got my card on there still.  They tryna charge me all kinda shit ga[n]g.

38.    According to records provided by World Travel Holdings Co. ("WTHC") and a review of the <u>calboythewildboy@gmail.com</u> e-mail account:

    a.    On or about July 6, 2017 (*i.e.*, the same day Strong sent Wright a DM that stated "I got u today homie"), a WTHC representative sent an e-mail to <u>calboythewildboy@gmail.com</u>, confirming that customer Herbert Wright with telephone number (xxx) xxx-4180 had requested information for a Jamaican villa for eight adults from July 7 to 12, 2017. The list of travelers included Wright's companion AF (who had been a passenger on the fraudulently obtained Jet Partners, Epic Jet, ASG, and Planemasters flights), Wright's associate AB (who had also been a passenger on the fraudulently obtained flights), and six others.

    b.    On or about July 7, 2017, an individual who used the name "BH" electronically signed a rental agreement for Herbert Wright to stay at the Hanover Grange villa from July 7 to 11, 2017, for $14,549.  "BH" also requested that the contact e-mail be changed to <u>dwilliamsonla@gmail.com</u>.  WTHC accepted payment for this reservation in the form of a credit card x-3774 in the amount of $14,549.

    c.    On or about July 13, 2017, the transaction was charged back as fraudulent after the actual cardholder, RW, disputed the charge.

39.    On or about October 31, 2017, Wright released a music video, *Man Now*, that was filmed at the Jamaican villa.  <u>https://www.youtube.com/watch?v=pwdNcS_KpYg</u> (last visited



March 14, 2023).  As reflected in a news article on October 31, 2017, in a popular music magazine, *The Fader*, Wright stated: "Something that was destined for me in my life took me along a path to Jamaica, vacationing in a multi-million dollar estate." https://www.thefader.com/2017/10/31/g-herbo-man-now-video-premiere-humble-beast (last visited March 14, 2023).

### Wright's Post-Jamaica Requests To Strong For Services

40.     During the months after Jamaica, Wright continued to have contact with Strong, including to ask Strong for goods and services in various locations.

41.     On July 19, 2017, Wright sent this DM to Strong:  "Dude yo ass need to get me a whip hell naw ion owe you nomo favors dude you owe me all the favors now!!"

42.     Between August 21-22, 2017, the Wright x-6240 Phone had six contacts with (xxx) xxx-1844, which was used to commit numerous other frauds between August 17, 2017 and September 8, 2017 (none of which benefited Wright).

43.     On September 9, 2017, Wright sent this DM to Strong:  "I need a car in the Raq."

44.     On October 4, 2017, Wright sent this DM to Strong:  "Need a car in Miami its only for a day."

45.     Between October 6, 2017 and December 22, 2017, the Strong iPhone and the Wright x-0122 Phone exchanged approximately 812 messages.  For example, on November 16, 2017, the Wright x-0122 phone sent the Strong iPhone a text message that stated: "I need a whip in LA this Herb."

### Wright's Participation in the Dream Squad and Woof Woof Puppies Frauds

46.     As set forth below, starting on November 28, 2017, Strong used the name "Darren Geiger," telephone number (xxx) xxx-6735 ("the Strong x-6735 Phone"), and e-mail addresses globalmarketing@gmail.com and globalmarketing@gmail.com to defraud an exotic car rental and

chauffer company in Chicago called Dream Squad, LLC ("Dream Squad") and a designer pet store in Michigan called Woof Woof Puppies ("Woof Woof").

47.    Between November 28, 2017 and December 31, 2017, the Wright x-0122 Phone had 14 contacts with the Strong x-6735 Phone, which Strong used to commit both these and others frauds.

The Dream Squad Fraud

48.    On November 28, 2017, Wright sent these DMs to Strong:  "Aye bro get me a whip wtf dude.  In Chicago something . . . you just gone say fuck me & my Lil bread Ik it aint much to you.  What I gotta get on some gangsta wit you?"

49.    According to records of an exotic car rental and chauffer company in Chicago called Dream Squad, LLC ("Dream Squad"), also on November 28, 2017, a Dream Squad representative entered into two Rental Agreements for the following two cars:

    a.    A Mercedes Benz S560, to defendant Joseph Williams for one week in the amount of $4,410.  The Rental Agreement has the notation "Darren Geiger, Booking Agent."  No credit card was specified.

    b.    A Cadillac Escalade with IL license plate number AM47921 (the "Escalade") to "Abe" for one week in the amount of $1,000 with credit card number x-4146.  The Rental Agreement listed Darren Geiger as a secondary driver and noted that Geiger was a "booking agent."

50.    Also on November 28, 2018, the Wright x-0122 Phone and the Strong iPhone engaged in the following text exchange:

    Strong:  "If he ask u.  My name is Darren.  From epic Travel
    Agency.  From LAN.  LA. (emphasis added)."

\*\*\*   \*\*\*

Wright:  "Damn bro we finna finesse all week don't trip bitch you finna stick wit me.  But this official doe right dude finna come bring me the whip right now?  You finna pay him?"

Strong:  "Yea tell him you gonna let the travel agency pay for it I handle all of the travel in Chicago.  I got one of his cars now."

Wright:  "Ight bet yeah what you got doe? I might wanna switch lol."

\*\*\*   \*\*\*

Strong:  "I got it in Rodie name.  S560."  [Rodie" refers to co-defendant Joseph Williams, also known as "Joe Rodeo" or "Rodie."  "S560" refers to the Mercedes Benz rented in Williams's name from Dream Squad on November 28, 2017.]

Wright:  "You in A S? **Just get me a name to put my shit in real quick den?** (emphasis added)."

Strong:  "**Don't forget DARREN IS MY NAME IF HE ASK.  HE DOESN'T NO ANYTHING ELSE BUT DARREN.** (emphasis added)."

Wright:  "I gotchu bro he good.  Just answer when I call you Ima need you."

51.     During a later text exchange on November 28, 2017, Strong and Wright agreed to meet at a Chicago location for Wright to pay Strong money, which Wright left with his doorman.

52.     On December 2, 2017, the Dream Squad representative entered into a Rental Agreement for a Mercedes Benz S550 with a man who used the name Darren Geiger, the Strong x-6735 Phone, and the e-mail address globalmarketing@gmail.com.  The Rental Agreement has the notation "G Herbo Artist Booking" and was a three-week booking at $4,000 per week.

53.     Between November 28, 2017 and December 11, 2017, the Wright x-0122 Phone had 24 contacts, both incoming and outgoing, with telephone number (xxx) xxx-7022, which was used by the Dream Squad representative.

54.     Also on December 2, 2017, Wright and Strong engaged in the following text exchanges related to the Dream Squad car rental:

> Wright: "Naw bitch. What's that? Wya. On Vito bro why you playing wit me? Extend that whip bro that bitch ain't for no month why you be lying. What I pay you some mo bread bitch you already owed me to get the whip so why you ain't extend it when I paid you the other money bro. **You know it don't be costing you shit to do that shit dude!** (emphasis added)."

> Strong: "Dude u good I told you stop texting me about that car. I told u u good already man."

> Wright: "On Vito Ight dude he said it was only for a week nigga so shid you tell me. Ion like that last minute shit bro a mf telling me some shit & didn't."

> Strong: "Cuz I'm doing it the way I suppose to do it evidentially if I ain't do it that way that's not the way to do it homie. U good?"

> Wright: "You right boss man. []."

55.     On December 5, 2017, Wright and Strong engaged in a lengthy text exchange about the Dream Squad rental:

> Strong: "Bro he waxin us. This shit to high." [*Strong sent a Dream Squad Invoice, dated December 2, 2017, in the amount of $8,820*]. *** ****

> Strong: "Call me. Yoooo. Herb. **Call dude with the car tell him Darren taking care of the shit now man. He steady rushing me I'm just waiting for my shit to load. I told him I'm on phone w bank. Tell his ass to cool out. U hear me.** (emphasis added)." *** ***

> Wright: "I just acted like I'm finna call. You Ima hit him back in a second and tell him that you gone get on top of all that shit. He just think you send him off bro prolyl."

> Strong: "Every payments he been asking for I been lying it. Paying it. But this recent one he just sent. For 8k."

> Wright: "Yeah I told his ass go down too on the prices on Vito."

\*\*\* \*\*\*

<u>Wright</u>: "Right what you want me to tell this nigga when I call back doe?

<u>Strong</u>: "We a pay him 4 now. For this upcoming week an the other 4 next week like we did."

<u>Wright</u>: "Ight bet just answer Ima hit him."

\*\*\* \*\*\*

<u>Wright</u>: "Take care of that shit he said you good pay the 4 now & the other 4 next week or whenever. & I told him go down on them fucking prices too doe but I said we gone pay this time but next time he gotta lace us. Just pay his goof ass doe cuz I told him you official he back on yo dock cuz of me bitch. Pay 4 that shit doe SAP gang."
\*\*\* \*\*\*

<u>Strong</u>: **"Just had to buy hella moves with my last for u.** (emphasis added)."

<u>Wright</u>: **"Yeah I need that whip doe dude Ima keep paying you if you can keep getting them just don't act slow when its time to get it for me.** (emphasis added). Ight bet . . yeah you know I need it dude this the same shit we was doing in Miami."

<u>Strong</u>: "It's paid **I have nothing Now no gas or shit on my site. Now I'm on square 1.** (emphasis added)."

<u>Wright</u>: "& I tried to get you the bread this morning you ain't call me back."

<u>Strong</u>: "Bro so what do I do. **I'm on stuck. Now u leave me on stuck. When u together.** That's all I be saying. (emphasis added)." [*Strong then sent the following image of a dark web site that sells credit card account information with a balance of only $15.41*].



<u>Strong</u>: **"Look at my account I can't get no moves or shit get a room or nothing g.** (emphasis added)."

<u>Wright</u>: "Bro you act like you ain't owe me this nigga how the fuck I leave you on stuck bro!! You gotta stop making all this shit my problem like I don't come thru for you every time. On Vito bro I'm the reason you even did this shit cuz you was telling me send this do this do that . . . & I still just hit you again. I was gone send you some bread for the crib and shit but bro what you want that shit to come out of my pocket every time dude. & how the fuck Ima get some money to you anyway? You said the other day you can't even pick shit up on the road. You stay black mailing a MF boa. What you want me to do bro you hell. I'll hit you doe when I leave this shit I'm in the hospital bitch."

56.    All of the charges were disputed as fraudulent, and Dream Squad lost $34,025.

57.    On December 15 and 31, 2017, the Dream Squad representative sent the following

DMs to Wright's Instagram account concerning the Dream Squad car rental:

     a.      December 15: "I need the car bro. . . . Your guy disputed all his transactions

for the whole car rental."

     b.      December 31: "Happy New Years!!!  And am taking action about the

fraud."

58.    Wright did not respond, nor did he pay Dream Squad.

<u>The Woof Woof Puppies Fraud</u>

59.    According to records and information provided by Woof Woof Puppies & Boutique

("Woof Woof"), its owner, and its manager:

     a.      On November 29, 2017 (*i.e.*, one day after the start of the Dream Squad

transactions), an individual (Strong) used the name "Darren Geiger," the Strong x-

6735 Phone, and e-mail address globalmarketingworldwide@gmail.com to order

puppies and accessories with credit card account x-5433 for a total cost of $10,485.

     b.      Strong said he wanted to purchase puppies for his client, Wright, and he

referred the Woof Woof owner to Wright's Instagram account, which listed several

million followers and was already following Woof Woof's account.

     c.      The Woof Woof owner sent "Geiger" pictures of the puppies and spoke with

him by phone approximately nine times that day.  "Geiger" also said he had already

hired a limo driver to pick up the puppies.

     d.      "Geiger" sent her a photograph of his driver's license but he refused to

photograph himself with the driver's license as further proof of his identity.

     e.      The Woof Woof owner then asked to speak with Wright to confirm that he

was actually receiving the puppies, and received a call from a person who

represented himself as Wright using telephone number (xxx) xxx-9999 (the "Hayes



x-9999 Phone").  [During a law enforcement operation in Chicago on December 28, 2017, Wright's co-defendant Stephen Hayes told CPD Detectives that his telephone number was the Hayes x-9999 Phone."]

      f.      The Woof Woof owner wanted further proof that Wright would be receiving the puppies, so she asked Wright to message her through Instagram.  The Woof Woof owner sent several Instagram DMs to Wright, and Wright confirmed he was getting the puppies.  After obtaining this confirmation from Wright, the Woof Woof owner then provided the puppies to the limo driver.

      60.      According to records seized from Strong's iPhone, prior to the sale on November 29, 2017, Strong engaged in a lengthy text exchange with the Woof Woof owner.  Strong introduced himself as "Darren [Geiger] With Empire."  The Woof Woof owner sent Strong photographs of the puppies, and agreed to sell the puppies for $9,500.  The Woof Woof owner then sent a $9,500 credit card receipt for account x-5433, but stated that someone would have to sign the receipt and present identification.  Strong sent a photograph of the fictitious Washington State driver's license for "Darren Geiger," but Woof Woof asked for "Geiger" to take a photograph of the driver's license next to his face to confirm his authenticity, and Strong refused.

      61.      Also on November 29, 2017, the Strong iPhone contained the following text exchange with the Wright x-0122 Phone:

> Strong:  [*No text – Strong sent Wright the photographs of puppies that Woof Woof had sent Strong*].
>
> Wright:  LOL where them @
>
> Strong:  *[No text – Strong sent Wright a partial picture of the same sales receipt that Woof Woof had sent Strong].*  Got 2 now
>
> Wright:  I'm in this class folk now lol

<u>Strong</u>: Check DM.  Hurry just message that bitch hello

62.     According to Wright's Instagram account records, also on  November 29, 2017, Wright engaged in the following DM exchange with Woof Woof's Instagram account *woofwoofpuppies*:

<u>Woof Woof</u>:  Hi .  Hello.  Message me here.  Hello.  You are getting 2 puppies correct?  ?

<u>Wright</u>:  Yes.

<u>Woof Woof</u>:  Ok.  Thank Yoo.  *You.

<u>Wright</u>:  No problem thank you.

63.     A driver named from American Airport Car Services ("American Car") picked up the puppies from Woof Woof and drove them to Chicago, where she dropped off the puppies with a man and his car.  The driver sent Woof Woof the photographs of the man (Strong) and his car (the Escalade rented from Dream Squad).

64.     According to the American Car customer trip sheet for this job:

a.     The billing client was Darren Geiger of Epic Travel, with the Strong x-6735 Phone, and e-mail address <u>globalmarketingworldwide@gmail.com</u>.

b.     A payment of $742 was charged to credit card account x-5433 (*i.e.*, the same account charged by Woof Woof).

65.     According to Bank of America ("BOA"), account number x-5433 belongs to an individual, DB, of Mercer, WI, who disputed several fraudulent charges between November 29 and December 3, 2017, including $9,500 and $958 at Woof Woof and $752 at American Car Service.

66.     On December 6, 2017, Wright sent Strong a text message relating to the Woof Woof fraud: **"I already finessed these dogs for you & didn't give no fuck ik you sold at least one what you did wit the bread ain't my problem** but Aye my Brother send that money Ik you got it I don't give a fuck what kind of crib you get but make it yo business to call me in the hospital when yo ass ain't get no bread yet!! (emphasis added)."

67.     On January 23, 2018, the Woof Woof owner attempted to follow up with Wright concerning the chargeback, and sent him an Instagram DM of a photograph depicting Strong and the American Car driver noting "Proof you got 2 puppies."

68.     Later that day, Woof Woof sent Wright additional DMs, including the following:

> "We had 2 yorkie puppies sent to Herbert Wright (G Herbo) this past Nov 2017. We recently received a chargeback today stating that this was a fraudulent transaction when it obviously wasn't. Please resolve this matter as soon as you can, thanks. Below are the pictures of Mr. Wright with the puppies."

69.     On January 29, 2018, Woof Woof and Wright engaged in the following DM exchange:

> Woof Woof:  "Before I go to the police department do you want the resolve this ??  We have you in the photo, witnesses, license plate. This is a felony.  Before this goes any further did you want to resolve ?????"
>
> Wright:  "Don't you see the pictures on my page??? Does that look like me in that pic??  I never met you."
>
> Woof Woof:  "You messaged me while I was on the phone with you from your official page.  The phone call was recorded and here's your message confirming you were getting 2 puppies came DIRECT



from your OFFICIAL Instagram page." [*Woof Woof sent a screenshot of Wright's DMs confirming that was getting the two puppies*].

<u>Woof Woof</u>: "The drive[r] is also a witness. All of this is going to the local police. They will investigate. You messaging from your official Instagram page shows you were getting 2 puppies" [*Woof Woof sent same screenshot again*]. "What are you gonna say?? That's not you?? That you from you page while I was on the phone with you and the phone conversation was recorded and that message from your Instagram page came at the same time I told you to send it to confirm that was you." [] [*Woof Woof sent photos of Strong with the American Car driver who delivered the puppies from Woof Woof*].

70.    Wright never informed Woof Woof of Strong's identity, never responded further, and never paid Woof Woof.

### Wright's False Statements To Federal Agents

71.    On November 24, 2018, Special Agent Tyler Martin of the United States Secret Service (accompanied by a Special Agent with the FBI) conducted a video-recorded, *Mirandized* interview of Wright. During this interview, Wright falsely stated that he never provided Strong any money; he never received any thing of value from Strong; and he had no direct relationship with Strong.

### Loss Attributed to Wright

72.    Based upon the following calculation, the loss attributed to Wright is $139,878.

| Date | Amount | Victim / Thing of Value | Card Number / Holder |
|---|---|---|---|
| 03-09-17 | $24,730 | Planemasters / private jet flight | x-2333 / BA |
| 03-44-17 | $20,679 | ASG / private jet flight | x-5202 / LD |
| 03-16-17 | $15,015 | Epic Jet / private jet flight | x-8938 / PS |
| 03-17-17 | $19,760 | Jet Partners / private jet flight | x-5938 / BM |
| 07-07-17 | $14,549 | World Travel Holdings Co. / villa | x-3774 / RW |
| 11-28-17 to 12-15-17 | $34,025 | Dream Squad | Various cards |
| 11-29-17 | $10,458  $ 752 | Woof Woof Puppies / puppies  Airport Car and Limo Service / car | x-5433 / DB |

---