UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 20-30033-MGM |
| | ) | Crim. No. 21-30031-MGM |
| v. | ) | |
| | ) | |
| ANTONIO STRONG, *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM
FOR DEFENDANT HERBERT WRIGHT III**

The United States of America, by and through Joshua S. Levy, Acting United States Attorney for the District of Massachusetts (Steven H. Breslow, Assistant United States Attorney, appearing) and Glenn S. Leon, Chief, United States Department of Justice, Criminal Division, Fraud Section (Trial Attorneys Andrew R. Tyler and Kyle Crawford, appearing) (collectively, "the Government"), hereby files its Sentencing Memorandum for the defendant Herbert Wright III ("Wright" or "the defendant").

1.  Introduction

On July 28, 2023, the defendant pleaded guilty pursuant to a written plea agreement in connection with two cases:

- First, the defendant pleaded guilty to Count One of the Indictment in 20-CR-30033-MGM charging conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.

- Second, the defendant pleaded guilty to Count One of the Information in 21-CR-30031-MGM charging false statements in violation of 18 U.S.C. § 1001(a)(2).

As part of the plea agreement, the Government agreed to dismiss the remaining charges against the defendant, which included two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) and which are subject to a two-year mandatory minimum sentence.  *See* ECF 233

(Plea Agreement); *see also* Presentence Investigation Report ("PSR").

The defendant faces an Advisory Sentencing Guidelines Range ("Guidelines") of 12 to 18 months of incarceration based upon a Total Offense Level of 13 and Criminal History Category I, and a maximum term of 36 months of supervised release.  PSR ¶¶ 142, 144, 146.

The defendant agreed to pay a total amount of restitution of $139,968[1], apportioned as follows:

- $24,730 to Planemasters, Ltd.;

- $20,679 to Aircraft Service Group, Inc.;

- $15,015 to Epic Jet, LLC;

- $19,760 to Jet Partners Worldwide, Inc.;

- $14,549 to World Travel Holdings Co.;

- $34,025 to Dream Squad, LLC;

- $10,458 to Woof Woof Puppies; and

- $752 to Airport Car and Limousine Service.

The defendant also agreed to a Forfeiture Money Judgment of $139,878.[2]  *See* ECF 233

---

[1] Due to a typographical error, the plea agreement indicates inadvertently that the total loss attributed to Wright and total restitution is $139,878.  *See* ECF 233 (Plea Agreement) at p. 3 ¶ 4(e) & p. 30 ¶ 72.  When added correctly, however, the total amount of restitution is in fact $139,968 (*i.e.*, $90 more), which is the amount of restitution that the Government seeks to be imposed as part of the defendant's sentence.  In any event, the Court has an independent obligation in this case under the Mandatory Victim Restitution Act to order full restitution to victims.  *See* 18 U.S.C. § 3663A.

[2] The plea agreement also indicates inadvertently that the total Forfeiture Money Judgment is $139,878 (*i.e.*, $90 less than it should be).  *See* ECF 233 (Plea Agreement) at p. 5 ¶ 7.  Given the de minimis $90 difference, however, the Government is not recommending any modification, as such additional money would be forfeited only to the United States Treasury and not to victims of the defendant's offense.  Accordingly, the Government is recommending a Forfeiture Money Judgment for $139,878 as per the plea agreement.

(Plea Agreement) at p. 5 ¶ 7.

The Government respectfully recommends that the Court impose the following sentence:

- Incarceration of one year and one day (*i.e.*, the low end of the defendant's Guidelines);

- Supervised release of 36 months;

- Entry of a Forfeiture Money Judgment for $139,878;

- Entry of a Restitution Order for $139,968;

- A fine of $55,000 (*i.e.*, the top end of the Guidelines fine range); and

- A mandatory special assessment of $200 under 18 U.S.C. § 3013(a)(2).

The recommended sentence considers "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); and will adequately "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense," § 3553(a)(2)(A); "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant," § 3553(a)(2)(B)-(C); and "provide the defendant with . . . medical care, or other correctional treatment," § 3553(a)(2)(D).

2.     The Defendant's Offense Warrants the Recommended Sentence

a.     Legal Principles

As the Supreme Court explained in *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007), the district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range, and then considering all the factors under 18 U.S.C. § 3553(a) to determine whether they support the sentence recommended.  The district court may not presume that the Guidelines range is reasonable, but it must make an individualized assessment based on the facts presented.  *Id.*

If the district court determines that a non-Guidelines sentence is warranted, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 597. A major departure requires greater justification than a minor deviation. *Id.* The district court's explanation must allow for appropriate appellate review and promote the perception of fair sentencing. *Id.*

In most instances, "the Guidelines are not only the starting point . . . but also the lodestar." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016). The Guidelines "anchor the court's discretion in selecting an appropriate sentence." *Id.* at 1349. Starting with the Guidelines' framework helps promote uniformity and fairness. *United States v. Rodriguez*, 630 F.3d 39, 41 (1st Cir. 2010).

As the Supreme Court observed in *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007), the sentencing judge and the Sentencing Commission are carrying out "the same basic § 3553(a) objectives, the one, at retail, the other at wholesale." In other words, the Sentencing Commission's Guidelines are "a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* at 2465.

Given these legal principles, the Government's recommended sentence aligns with the statutory sentencing goals articulated in 18 U.S.C. § 3553(a), and accordingly, should be the sentence imposed by the Court.

b.    The Nature and Circumstances of the Offense

As detailed more substantially in the plea agreement's "Statement of Facts" and the PSR, between at least March 9, 2017 through November 24, 2018, the defendant conspired with co-defendant Antonio Strong ("Strong") and others to defraud businesses and individuals by possessing, using, and transferring unauthorized and stolen payment card account information (the

"Illicit Account Information") to obtain valuable goods and services.[3] PSR ¶ 10.   The Illicit Account Information, which the co-conspirators called "moves," included the actual cardholders' names, addresses, payment card account numbers, security codes, and account expiration dates. *Id.* at ¶ 11.

To perpetrate the fraud, Wright, Strong, and other co-conspirators used various telephone numbers, email accounts with fictitious names and companies, and aliases such as "BH," "Walter O'Malley," and "Darren Geiger." *Id.* at ¶ 12.   BH is a real person and resident of the Chicago area who never authorized, or even knew about, the transactions executed in his name.   Walter O'Malley and Darren Geiger are fictitious identities. *Id.*   For example, to book luxury vehicle rentals with Illicit Account Information, Strong used the alias of "Darren Geiger" and reminded Wright "Don't forget DARREN IS MY NAME" to which Wright replied, "I gotchu bro[.]" *Id.* at ¶ 54-55.

Generally, because the co-conspirators provided authentic payment card information, the defrauded businesses and individuals successfully processed their transactions and provided the goods and services. *Id.* at ¶ 13.   The actual cardholders typically discovered these transactions on their accounts and disputed the charges.   The actual cardholders' payment card companies then reversed their payments and charged back the transactions to the businesses and individuals, which consequently suffered losses in the amounts of the unauthorized transactions. *Id.*

---

[3] During this time, the defendant—Herbert Wright III—was a rap artist known as "Lil Herb," "Herb," and "G Herbo," based in the area around Chicago, IL. *Id.* at ¶ 10.

Wright's primary role in the conspiracy involved frequent requests to Strong for goods and services such as flights, vehicles, and accommodations that Wright knew Strong procured by fraud. Using these goods and services, Wright traveled to various concert venues and advanced his music career by, for example, posting photographs and videos of himself in extravagant settings. *Id.* at ¶ 15. In particular, using fraudulently obtained goods and services, Wright knowingly took advantage of:

- four private jet charters;

- exotic car rentals; and

- a luxury villa in Jamaica (for which Wright requested that Strong provide vehicles and an additional credit card account for Wright's incidentals).

*Id.* at ¶ 14.

Wright's role in the conspiracy, however, was not limited to knowingly receiving fraudulently obtained goods and services but extended to direct communication with victims in furtherance of the conspiracy, paying Strong in exchange for fraudulently obtaining goods and services, and lying to federal law enforcement.

For example, in 2017, Wright helped Strong obtain designer puppies from a pet store using Illicit Account Information by falsely communicating to the business that Wright was the actual purchaser of the puppies and by concealing Strong's actual identity from the business. *Id.* at ¶¶ 64-75. The individual to whom the Illicit Account Information belonged disputed several fraudulent charges related to the purchase of the puppies, and the pet store therefore received chargebacks related to these transactions, incurring approximately $10,000 in losses. *Id.* at ¶¶ at 64-67. Wright later sent a text message to Strong, noting that Wright had "finessed these dogs for [Strong]" and then demanded that Strong send him money. *Id.* at ¶ 71. When the pet store owner

informed Wright that it had received a chargeback for the puppies and sent Wright a photograph of Strong as "proof you got 2 puppies," Wright simply responded that the photograph did not depict himself.  *Id.* at ¶¶ 72-75.

Similarly, when fraudulently obtaining luxury vehicle rentals, Strong and Wright coordinated their communications to the rental car business, and Wright communicated with the car rental business in furtherance of the conspiracy.  For example, when Strong asked Wright to "[c]all dude with the car tell him Darren [an alias for Strong] taking care of the shit now" Wright responded, "I just acted like I'm finna call [y]ou Ima hit him back in a second and tell him that you gone get on top of all that[.]"  *Id.* at ¶ 60.  In texts, Wright also acknowledged paying Strong in exchange for fraudulently obtaining rental cars using Illicit Account Information.  For example, when Strong wrote a text message to Wright stating, "Just had to buy hella moves [referring to Illicit Account Information] with my last [money] for u" Wright replied, "I need that [car] doe dude Ima keep paying you if you can keep getting them[.]" *Id.*

Moreover, on or about November 24, 2018, when a Special Agent of the United States Secret Service interviewed Wright concerning the fraud and his relationship with Strong, Wright attempted to conceal his role in the conspiracy by stating falsely that:

      i.  he never provided Strong any money;

     ii.  he never received any thing of value from Strong; and

    iii.  he had no direct relationship with Strong.[4]

*Id.* at ¶ 17.

---

[4] Although false, these statements did not materially obstruct the investigation or prosecution of the charged offenses.  The Government is therefore not seeking a two-level enhancement for obstructing or impeding the administration of justice under Guidelines § 3C1.1.

In truth, however, Wright provided Strong with money, Wright received flights, vehicles, and accommodations from Strong using Illicit Account Information, and Wright and Strong communicated frequently concerning their illicit transactions.  *Id.*  That said, the Government's investigation did not discover evidence that Wright transferred or sold Illicit Account Information to any other person or that Wright himself purchased Illicit Account Information from any dark web site.  *Id.* at ¶ 16.  Nonetheless, Wright was a member of the conspiracy, and he helped further the conspiracy to defraud various businesses and individuals.

c.    History and Characteristics of the Defendant

The history and characteristics of the defendant weigh in favor of the recommended sentence, which is at the low end of the Guidelines.  *See* 18 U.S.C.  § 3553(a)(1).

First, the defendant grew up in "a lower-income area characterized by gang activity, drugs, and violence . . . the defendant saw his first murder at age 9 . . . he frequently witnessed drug abuse and violence and had to deal with gang members[.]"  PSR ¶ 116.  The defendant's childhood circumstances resulted in diagnoses of post-traumatic stress disorder, depression, and anxiety, for which he first sought treatment in 2018.  *Id.* at ¶ 129.

Second, as the defendant achieved financial success as a rap artist (he reports earning currently between $50,000 to $75,000 per month, *Id.* at ¶ 135), he has "help[ed] the less fortunate in the Chicago community" by, among other things, contributing to the redevelopment of a former elementary school in 2018 and launching Swervin' Through Stress—an initiative that provides Black inner-city youth with therapeutic resources to improve their mental health, in 2020.  *Id.* at ¶ 131.

Third, the defendant has some prior criminal history.  In 2019, he received two years of probation for the unlawful possession of a firearm.  *Id.* at ¶ 96.  As detailed in the PSR, police observed the defendant in a car with a pistol that had 30 rounds of ammunition and police also recovered additional ammunition from a backpack in the defendant's possession.  *Id.*  In 2023, the defendant was also charged—in a currently pending case—with the unlawful use of a weapon. Police allegedly observed the defendant in a car with three other people and the defendant "quickly reach[ed] towards the center console" where police found a loaded semi-automatic handgun.  *Id.* at ¶ 100.

Lastly, although the defendant has not been in full compliance with his conditions of pretrial release in this case, those lapses appear related to substance abuse.  *Id.* at ¶ 4.  For example, the defendant tested positive for marijuana multiple times, after which he participated in court-ordered substance abuse evaluation and subsequent treatment.  *Id.* at ¶¶ 4, 132-33.  Before his arrest in this case, the defendant also twice sought treatment for opiates, most recently in 2018, and has not used opiates again.  Based upon this history, the Government recommends that the Court order the defendant to undergo substance abuse treatment as a condition of his sentence.

Taken together, Wright's history and characteristics weigh in favor of a sentence at the low end of the Guidelines (*i.e.*, one year and one day of incarceration).  Although he has some criminal history and has had some lapses while on pretrial release in this case related to apparent substance abuse, the defendant has also shown that he is attempting to make a strong, positive impact on his community.  While the Government's recommended sentence will hold the defendant adequately accountable for his misconduct, it will also ensure his relatively swift reentry into society where he can hopefully continue his positive and productive trend, both for himself and his community.

d.      The Need for the Sentence Imposed

The recommended sentence is sufficient, but not greater than necessary, "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant," §§ 3553(a)(2)(B)-(C), and considers the need for the sentence "to provide the defendant with . . . medical care, or other correctional treatment," § 3553(a)(2)(D).   Here, the recommended sentence of one year and one day of incarceration—which is at the low end of the defendant's Guidelines range—along with 36 months of supervised release serves all these crucial sentencing goals.  18 U.S.C. § 3553(a).

While this sentence reflects the gravity of the defendant's offense—which victimized many small businesses and individuals—it also recognizes and is balanced against the defendant's lesser role compared to his other co-conspirators.  Unlike his other co-conspirators, the Government did not obtain evidence that the defendant transferred or sold Illicit Account Information.  Moreover, the defendant's crimes occurred over five years ago; since then, the defendant has had a successful music career and engaged in charitable activities in Chicago.  As noted above, for example, in 2020 the defendant founded an initiative that provides Black inner-city youth with resources to improve their mental health.  Given his successful career in which the defendant earns substantial income, the defendant should have no need to engage in further financial fraud schemes.

Moreover, the Government's recommended sentence will promote respect for the law, where the defendant, among other acts of misconduct, sought to conceal his role in the scheme by denying to the investigating agents any financial relationship with co-defendant Strong.  Despite his ultimate admission of guilt in this case, it is nevertheless important to signal to the public that misleading, and lying to, federal law enforcement will be addressed adequately.

Further, the recommended sentence reflects adequately the need to deter others from committing similar crimes. Credit card fraud is a growing problem in the United States. In 2022, "[n]early 40,000 Americans reported an instance of credit card fraud . . . up 23 percent from the year before."[5] This trend justifies a meaningful sentence being imposed to send a clear message about the future that others might face who are contemplating engaging in similar credit card fraud schemes.[6]

The Government also recommends a 36-month term of supervised release—as it agreed to recommend in the plea agreement—to provide the defendant with support and services while he transitions out of incarceration, while also providing him with resources to address his substance abuse issues.

In his sentencing memorandum, the defendant contends that a downward departure to a sentence of probation is warranted, in part, because the defendant had a comparatively minor and passive role in the offense. *See* ECF 265 at 9-10. However, several factors that the defense relies upon—that the loss amount attributed to the defendant is a small fraction of the overall loss caused by other co-defendants and the defendant's lack of contact with other co-conspirators—are already

---

[5] Chris Velazco, *Washington Post*, Credit Card Fraud Isn't Going Anywhere, available at: https://www.washingtonpost.com/technology/2023/08/02/credit-card-fraud-tips-ai/ (last visited Jan. 8, 2024).

[6] The Government recognizes that its recommended sentence exceeds the average length of incarceration (8 months) and the median length of incarceration (6 months) for defendants who received incarceration with the same total offense level and criminal history category as the defendant. PSR at ¶ 163; *see* 18 U.S.C. § 3553(a)(6) (stating that a factor to be considered in sentencing is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). These statistics have limited relevance, however, because they lack detail about the facts and circumstances of the individual cases that a court must necessarily consider. Moreover, a sentence of a year and a day is appropriate based on the reasons outlined here in the Government's sentencing memorandum.

accounted for in the Guidelines calculation because the Government only sought to include in the loss amount those transactions that the defendant participated in or personally benefited.  Because Wright was a full member of the conspiracy who helped further the conspiracy to defraud various businesses and individuals for over a year and a half, he merits a Guidelines sentence, albeit at the bottom of the Guidelines.

           e.       <u>The Need for a Fine</u>

The Government further recommends that the Court impose a fine of $55,000, at the top end of the Guidelines fine range, to serve as just punishment and to adequately reflect the seriousness of the defendant's offense.  *See* Guidelines § 5E1.2(c)(3).  According to the Guidelines, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." *Id.*  Here, however, the defendant can seemingly pay a fine because he reports currently earning approximately $50,000 to $75,000 per month as a musician.  *See* PSR ¶ 135.

           3.      <u>Conclusion</u>

For the foregoing reasons, the Government respectfully recommends that the Court impose a sentence of incarceration of one year and a day, supervised release of 36 months, entry of a Forfeiture Money Judgment for $139,878, entry of a Restitution Order for $139,968, a fine of $55,000, and a mandatory special assessment of $200 under 18 U.S.C. § 3013(a)(2).  The Government also recommends that the Court order the defendant to undergo substance abuse treatment as a condition of his sentence.

*     *     *

Respectfully submitted,

JOSHUA S. LEVY                                    GLENN S. LEON
Acting United States Attorney                     Chief
Unites States Attorney's Office                   United States Department of Justice
District of Massachusetts                         Criminal Division, Fraud Section

Steven H. Breslow  Digitally signed by Steven H.
                   Breslow
                   Date: 2024.01.08 17:03:05 -05'00'

By:   /s/ Steven H. Breslow              By:   /s/ Andrew R. Tyler
      STEVEN H. BRESLOW                         ANDREW R. TYLER
      (NY2915247)                               Trial Attorney
      Assistant U.S. Attorney
      300 State Street, Suite 230               /s/ Kyle Crawford
      Springfield, MA 01105                     KYLE CRAWFORD
      413-785-0330                              Trial Attorney
      steve.breslow@usdoj.gov

Dated:  January 8, 2024

## Certificate of Service

I hereby certify that this document was filed by ECF to the registered participants as identified on the Notice of Electronic Filing.

                    By:     /s/ Steven H. Breslow
                            STEVEN H. BRESLOW
                            Assistant U.S. Attorney