```
1                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
2                            WESTERN SECTION

3

4    UNITED STATES OF AMERICA,        )
                      Plaintiff,      )
5                                     )
     vs.                              )   Nos. 3:21-CR-30031-MGM
6                                     )           and
     HERBERT WRIGHT,                  )       3:20-CR-30033-MGM
7                     Defendant.      )

8

9           Before the Honorable Mark G. Mastroianni
                  United States District Court Judge
10

11          Sentencing held in Hampden Courtroom

12

13                 Thursday, January 11, 2024
                          2:00 p.m.
14

15

16

17

18

19

20

21                                United States Courthouse
                                  Hampden Courtroom, Third Floor
22                                300 State Street
                                  Springfield, Massachusetts 01105
23

24                      Leigh B. Gershowitz, RMR, CRR
                        Official Federal Court Reporter
25                          Leighjoeem@gmail.com
```

1    APPEARANCES:

2    On Behalf of the Government:

3          UNITED STATES ATTORNEY'S OFFICE
           By:  Steven H. Breslow
4          300 State Street, Suite 230
           Springfield, Massachusetts 01105-2926
5          413-785-0235
           steve.breslow@usdoj.gov
6
           U.S. DEPARTMENT OF JUSTICE
7          CRIMINAL DIVISION, FRAUD SECTION
           By:  Kyle Crawford
8          950 Constitution Avenue, NW
           Washington, D.C. 20530
9          202-794-4010
           kyle.crawford@usdoj.gov
10
     On Behalf of the Defendant:
11
           PRINCE LOBEL TYE LLP
12         By:  James W. Lawson
           One International Place, Suite 3700
13         Boston, Massachusetts 02110
           617-456-8085
14         jlawson@princelobel.com

15   ALSO PRESENT:

16         Richard Rinaldi, USPO

17

18

19

20

21

22

23

24

25

1                       P R O C E E D I N G S

2                (Sentencing commenced at 2:13 p.m.)

3                   (The defendant is present.)

4            THE CLERK:  Your Honor, the matter before the Court

5   is Criminal Case 20-CR-30031 and 20-CR-30033, United States

6   of America versus Herbert Wright.

7            Counsel, can you please identify yourself for the

8   record, starting with the Government.

9            ATTORNEY BRESLOW:  Steven Breslow for the United

10  States.  Good afternoon, your Honor.

11           THE COURT:  Good afternoon.

12           ATTORNEY CRAWFORD:  Also for the United States, Kyle

13  Crawford from the Department of Justice Fraud Section.

14           THE COURT:  All right.  Thank you.

15           ATTORNEY LAWSON:  Good afternoon, your Honor.  Jim

16  Lawson on behalf of Herbert Wright, who is with me at the

17  table.

18           THE COURT:  All right.  Very good.  Thank you.

19           All right.  Relative to the presentence report,

20  Attorney Lawson, have you reviewed the presentence report

21  with your client and resolved any questions or issues

22  regarding that report with him?

23           ATTORNEY LAWSON:  Yes, your Honor.  That has been

24  done.

25           THE COURT:  All right.

1          Mr. Wright, I just need to make a record of asking

2     you, if you have reviewed the presentence report, both

3     yourself and with your attorney?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  All right.  Do you understand it and --

6     first of all, did you understand all of it, and second, are

7     there any issues that you want to talk to your attorney about

8     or you need clarification on?

9          THE DEFENDANT:  Yes, your Honor.  I fully understand

10    everything.  And I spoke with my attorney regarding anything.

11    And there's no questions, your Honor.

12         THE COURT:  All right.  Very good.  Thank you.

13         All right.  Mr. Wright, at your sentencing today,

14    you have the right to say anything or to tell the Court

15    anything you would like the Court to consider in your

16    sentencing.  At the appropriate time, I'll tell you when I'll

17    need to know if you want to address the Court or not.

18         You don't have to say a word.  And I won't hold it

19    against you in any way if you don't want to say anything.

20    You can rely entirely upon what your attorney says and the

21    written materials that he presented on your behalf.  Do you

22    understand?

23         THE DEFENDANT:  Yes.  Thank you, your Honor.

24         THE COURT:  All right.

25         All right.  We will start with the presentence

1    report.

2         All right.  Now, Attorney Lawson, I think I'm going

3    to address -- ask you to address something first because in

4    looking at the presentence report, I have to go through the

5    guidelines and the calculation of the guidelines.  And

6    although there was no objection to the guidelines filed, you

7    did raise an issue regarding a reduction for minimal

8    participant.  So formally there was no objection, so it

9    wasn't included in the guidelines.  But before I certify that

10   what I think the guidelines are, I need -- I guess we should

11   talk about that issue.

12         ATTORNEY LAWSON:  Yes, your Honor.  There's no

13   objection but that 13 is the total offense level.  I have

14   argued in the written materials and will argue briefly today

15   that Herb Wright played a minor role, that he was a minor

16   participant in the conspiracy charged, but I argue that as a

17   basis for downward departure, which I have raised in my

18   objections to --

19         THE COURT:  All right.  So you're

20   satisfied -- you're satisfied as to the accuracy of the

21   guidelines, but you're going to argue essentially a minimal

22   participant argument as a -- actually, it would be the basis

23   of a variance, I think.

24         ATTORNEY LAWSON:  Yes, your Honor.  That's correct.

25         THE COURT:  All right.  Thank you.

1          ATTORNEY LAWSON:  Thank you.

2          THE COURT:  All right.  Having reviewed that with

3    Attorney Lawson, I will say that I have reviewed the

4    guidelines and their calculation.  They -- as is

5    indicated -- show a total offense level of 13, a criminal

6    history category of 1, that falls in the guideline range of

7    12 to 18 months.  So I will find that the guidelines in a

8    technical sense are accurate and correct.  And I accept those

9    guidelines as being accurate and correct.

10         So in preparation for the sentencing, I have

11   reviewed the presentence report entirely -- multiple times

12   I've gone over it -- which, of course, includes -- it is

13   fairly well understood what it includes, but essentially the

14   life history of Mr. Wright, his background, any prior

15   involvement in the criminal justice system, the facts of this

16   case, the guideline calculation, and all of the factors that

17   were taken into consideration.

18         I've also considered the JSIN numbers.  That is

19   something that the Court looks at.  And the JSIN numbers in

20   this case indicate that for -- it is at page 163 of the

21   presentence report -- for the individuals surveyed,

22   essentially, the 1,088 defendants who were similarly-situated

23   on the guidelines, for the 683 of those 1,088 that received a

24   sentence, the sentence was an average of eight months and a

25   median of six months, again for similarly-situated with that

1   guideline of 12 to 18 months.

2          All right.  I've also reviewed the plea agreement.

3   I was familiar with it, but I reviewed it again.  I have

4   reviewed two victim impact statements.  And was there only

5   two for the Government?  Is there any more?

6          ATTORNEY BRESLOW:  No, your Honor.  We received them

7   and forwarded them to the court.  There are no others.

8          THE COURT:  All right.  So I have those.  And I have

9   reviewed those victim impact statements.  I have reviewed the

10  Government's sentencing memorandum.  I have reviewed the

11  Defendant's sentencing memorandum as well as all of the

12  attachments to the memorandum, which include very nice

13  letters written by family and friends as well as community

14  organizations regarding Mr. Wright's character and his -- his

15  contributions to his community and the type of person he is.

16  So I have reviewed that.

17         All right.  So the Government's memorandum indicates

18  the Government's recommendation on those guidelines of 12 to

19  18 is for a 12-month sentence, 12 and a day.  The defense is

20  making a recommendation to find minimal participation,

21  bringing down what -- in the analysis what the guidelines

22  would be arguably and supporting a sentence of straight

23  probation.

24         In this case, the Court signed an order regarding

25  restitution, the early payment of that, and the court costs.

1    So it is anticipated that restitution has already been paid

2    or will be paid.  That's been represented.  And I think

3    that's clear, the parties agree, that is going to happen.

4    The Court accepts that has either happened or will happen.

5          All right.  Attorney Breslow.

6          ATTORNEY BRESLOW:  Yes, your Honor.  We are

7    recommending 12 months and a day.  That's to provide

8    Mr. Wright the opportunity to earn good time credit and serve

9    a sentence that is considerably less than the 12 months.  We

10   think that this sentence, along with the other components of

11   restitution and forfeiture, supervised release with substance

12   abuse treatment and a fine of $55,000, is not greater than

13   necessary to reflect the statutory factors that the Court

14   must consider.

15         And I want to just run through them briefly with the

16   Court.  We address them in our papers.  But because we are

17   asking for a sentence of prison and as any sentence of prison

18   weighs heavy on the Court, we know, and on the individual

19   Defendant, we want to emphasize each of these factors and how

20   they affect our recommendation.

21         With respect to the first factor, the nature and

22   circumstances of the offense, the offense here is very

23   serious.  It victimized not big corporations, not faceless

24   nameless banks, but small businesses that suffered really

25   significant charge backs to their business operations, and

the individual cardholders whose account information was
stolen and used by Mr. Wright, the alleged ring leader
Antonio Strong, and the other co-conspirators.  I want to
emphasize that this was not a food where the
Defendant -- this was not a fraud where the Defendant was
stealing food to feed his family.  Instead, he and others
defrauded these small businesses of luxury items, like
private jets, exotic cars, and in particular for Mr. Wright,
a very fancy Jamaican villa.

            The seriousness of the offense is underscored by the
two victim impact statements that your Honor has read.  They
were both submitted from jet charter companies.  And as the
investigator and prosecutor of the case, I at first believed
that a private jet charter company was, you know, a
well-capitalized business because it involved private jets,
these very fancy and expensive forms of transportation.  But,
as the victim impact statements make clear, it is just the
opposite.  These are thinly capitalized, small businesses,
that suffer considerable losses from these frauds.

            I want to quote, just briefly, from the small
business victim one.  "The financial damage of these crimes
came directly out of our pockets, having to shoulder the
unexpected high dollar expenses, hurt our spouses, our
children and our families," enduring stress -- "created
enduring stress on our lives and relationships.  And it has

1    taken great effort to regain our reputation among our peers

2    in this relatively small industry of private jet charter

3    companies."

4         Small business victim two said something quite

5    similar.  They were deeply affected by the crimes.  They're

6    not publicly funded companies or large management companies

7    where the losses would be a rounding error.  Instead, this

8    company was founded out of an apartment, with the person's

9    own money.  They had to pay all of the aircraft operators,

10   the actual businesses that flew the jets, in full for the

11   fraudulent flights.  They lost 100 percent of this business.

12   And the owner of this company lost sleep for months and had

13   to fire employees to deal with the cost.

14        I do want to touch briefly because it relates to the

15   nature and circumstances of the offense on Mr. Wright's role.

16   We concede that Mr. Wright, compared to his codefendants, had

17   a relatively limited role.  We do agree with Mr. Lawson that

18   that limited role doesn't affect the guidelines calculation,

19   that there shouldn't be a role adjustment for the Defendant's

20   role in terms of the guidelines calculations.  But we want to

21   concede that Mr. Wright's role was limited in that he did not

22   possess, transfer, or directly use, or at least we didn't

23   discover he did, any illicit account information, other

24   people did that for the benefit of Mr. Wright.

25        But he did -- now I'm speaking about Mr. Wright in

1    particular -- he did have direct contact with two victims.

2    We outlined that in our sentencing memo.  And he participated

3    directly in the fraud scheme as it related to those two

4    victims.  And this is not insignificant either:  When

5    confronted by investigating agents, he chose to lie rather

6    than tell the truth or simply remain silent.

7            The second factor that the statute asks the Court to

8    consider is the history and circumstances of the Defendant.

9    And here, we believe that these history and circumstances

10   weigh in favor of leniency and our recommended sentence,

11   which although is a prison sentence, is at the bottom of the

12   guidelines and is designed to allow Mr. Wright to earn good

13   time credit and serve substantially less than the year in

14   prison that would otherwise apply.

15           There are several factors that we want to highlight

16   for the Court.  I expect Mr. Lawson is going to do the same,

17   but it is important to recognize that the Government sees

18   this as well.  First, the Defendant grew up in what I think

19   is uncontested an extraordinarily difficult and violent

20   environment, an environment where he witnessed his first

21   murder at age nine.  And he frequently had to deal with

22   violent and drug gang members outside of his -- outside of

23   his very home.

24           Second -- and this is unique among the codefendants,

25   at least thus far -- this Defendant achieved financial

1   success after he committed these crimes.  And as he has

2   achieved that success, he has given a portion of his earnings

3   back to the community.  And he did so, in part, even before

4   his indictment.  That's significant.  The postindictment

5   contributions to the community, the Government feels, matter

6   to a degree less because they could be seen as efforts to

7   improve the Court's view of the Defendant.  But where the

8   Defendant began to contribute to the community before his

9   indictment --

10          THE COURT:  Was it before -- it was before the

11   indictment, but was it after the point he was discovered by

12   law enforcement, in other words, approached and asked to give

13   a statement?

14          ATTORNEY BRESLOW:  Yeah, that's a fine question.  I

15   couldn't answer that directly right now.  I know when the

16   statements were.  I just don't know exactly when he began his

17   charitable contributions.  And I think that's probably best

18   addressed to Mr. Lawson because it involves the Defendant's

19   own -- own account of his charitable contributions.

20          Third, and this is important as well, the Defendant

21   has accepted full responsibility for his role in the offense.

22   With respect -- there are two cases, your Honor, that have

23   now been merged into one.  There's the fraud case and here,

24   the Defendant has been the first and by a long measure the

25   first of the codefendants to plea guilty.  And I believe he

1    has created momentum for the other codefendants to follow

2    suit, particularly given the Defendant's relative fame and

3    success as a rap artist.

4         And with respect to the false statements case, the

5    Defendant not only pled guilty but he agreed to waive venue

6    for those offense -- for that offense, the lying to the

7    investigators, and to waive indictment.

8         Lastly, this is, again, in the category of the

9    Defendant's history -- personal history and characteristics.

10   I want to emphasize two points that I expect Mr. Lawson may

11   raise with the Court.  The first is that, I do believe

12   Mr. Wright is a far different person now than he was when he

13   committed the crimes back in 2017 and a different person now

14   even then when he was charged with the crimes back in 2020.

15   And I think this is something to consider.  Certainly it is

16   something that we considered when we fashioned our sentencing

17   recommendation, that sentencing Mr. Wright to a lengthy

18   prison term would likely interrupt the ark of his personal

19   development, which has been towards the positive, and

20   possibly even increase the likelihood that he might

21   recidivate.  And that's why we're not asking for anything

22   like the high end of the guidelines or the middle of the

23   guidelines or even a straight 12-month sentence.

24        The last factors that the Court has to consider are

25   generally the need for the sentence imposed.  And here, the

1   recommended sentence is sufficient but not greater than

2   necessary to address these myriad factors.  Two of them are

3   to promote respect for the law and provide just punishment

4   for the offense.  And with respect to the former, a sentence

5   at the bottom of the guidelines is warranted, where the

6   Defendant not only engaged in serious fraud, we've

7   established that, but also brazenly lied to the investigators

8   by denying any financial relationship with the alleged ring

9   leader Antonio Strong.

10          And this isn't stated in the indictment, but I don't

11  think that the Defendant or Mr. Lawson will contest this.

12  The agents gave Mr. Wright multiple opportunities to concede

13  his financial relationships with Mr. Strong.  And Mr. Wright

14  just insisted that he had not a single financial relationship

15  with Mr. Strong, all of which was completely false and a

16  front to the investigators' attempts to resolve the case and

17  conduct law enforcement.

18          The second factors in this general category of the

19  need for the sentence imposed are to afford adequate

20  deterrence to criminal conduct, that's general deterrence and

21  to protect the public from further crimes of the Defendant,

22  here specific deterrence from Mr. Wright.  And taking that

23  last factor first, we don't believe that the Defendant is

24  likely to engage in further fraud, particularly given his

25  financial success.

1          Mr. Wright, I think it is safe to say, is earning

2    far more than anybody in this courtroom right now by a large

3    measure.  He earns $55,000 to $75,000 every month as a result

4    of his success in the rap world, a success that in some way

5    was accomplished through the fraud.  The fraud in this case

6    was Mr. Wright acquiring -- Mr. Wright with the, you know,

7    with the significant help of Antonio Strong, acquiring sort

8    of the trappings of rap success to promote himself.  These

9    are the private jets, the fancy cars, the Jamaican villa, all

10   of which ended up on Mr. Wright's Instagram or online in one

11   fashion or another to promote himself.

12          So I don't think he's at risk for recidivating for

13   this particular crime again, particularly when he committed

14   these crimes when he was a struggling artist and he had few

15   legitimate options.  Now he's not.  He's a successful artist

16   and he has many legitimate options.  But we do believe that

17   some prison sentence, in particular the one we're

18   recommending here, is warranted for general deterrence, to

19   deter others.

20          And lastly, the sentence should provide the

21   Defendant with other correctional treatment and to avoid

22   unwarranted sentencing disparities.  Here we are recommending

23   that Mr. Wright's sentence include some form of substance

24   abuse treatment, particularly given his history of substance

25   abuse, which, from my perspective, is completely

1    understandable given the traumatic nature of his childhood,

2    that somebody would end up, you know, using illicit

3    substances or abusing them.

4         And also to avoid unwarranted sentencing

5    disparities.  So your Honor mentioned the Sentencing

6    Commission's statistics.  They are lower, both the average

7    and the median, than what we're asking for.  But they're just

8    statistics.  And I think -- I'm sure the Court doesn't want

9    to give slavish adherence to sentencing statistics when the

10   Court recognizes that all sentencings, this one as well as

11   all of the others, are based on a myriad of individual

12   factors and that sentencing in any case has to be a matter of

13   individual justice.  Here, we've gone through the individual

14   factors that we think are relevant to the Court's ultimate

15   decision.  And where we come out is that there should be a

16   sentence at the bottom end of the guidelines range of a year

17   and a day.

18        We do want to emphasize that the Defendant has

19   already paid restitution and forfeiture.  He's likely the

20   only defendant to do so.  I think it bears emphasizing that

21   this is a factor or a feature of his full acceptance of

22   responsibility.  But I also don't think the Court

23   should -- and I know the Court isn't inclined to do this and

24   Mr. Lawson isn't inclined to argue this -- but a defendant

25   shouldn't seem to be buying their way out of an otherwise

1    appropriate sentence.  But it does, you know, bear emphasis

2    that Mr. Wright, as a matter of accepting full responsibility

3    as early as he did, with respect to the other codefendants in

4    the case, has already repaid the victims in full, as well as

5    paid forfeiture to the Government.  And that's significant.

6         THE COURT:  All right.  And the age of the case, can

7    you speak to the reason the case is so old?  I mean, the most

8    obvious is COVID likely, but it is a very old case.

9         ATTORNEY BRESLOW:  So -- well, the case was charged

10   in 2020.  The crimes took place in 2017 running through 2018.

11        THE COURT:  Right.

12        ATTORNEY BRESLOW:  And these are not easy cases to

13   investigate, particularly a case of this magnitude.  I want

14   to -- I want to emphasize that Mr. Wright's slice of the case

15   is relatively small.  That's I think in part what Mr. Lawson

16   is intending to argue to the Court as a so-called minor role.

17   The overall case, which involves numerous other codefendants

18   with other slices of the pie, and one codefendant who we

19   alleged to have the entire pie, is -- involves hundreds of

20   individual business victims, hundreds of individual

21   cardholders, you know, a fraud scheme that ran the entire

22   breadth and length of the country, from California to

23   Georgia, from Chicago all the way to Florida, and everywhere

24   in between.

25        THE COURT:  All right.  Thank you.

1          Attorney Lawson.

2          ATTORNEY LAWSON:  Yes, your Honor.

3          In the filing, your Honor, of the sentencing

4    memorandum and the attendant letters of recommendation, we

5    have attempted to put our best foot forward.  And so I will

6    not repeat in great detail the arguments that are already

7    before the Court in the filing of that memorandum and

8    attendant documents.  But I do want to touch today on what I

9    believe to be most important things, from my perspective at

10   least, for the Court to know about Herbert Wright.  And I

11   will, to the very very best of my ability, ask for a sentence

12   of compassion and ask for more specifically a sentence of

13   probation as appropriate for Herb Wright and who he is and

14   for the nature and circumstances and the totality of this

15   case.

16         Herb will himself in a few moments address the

17   Court.  And I'm confident that he will express his great

18   sorrow and regret for the commission of the crimes to which

19   he has pled guilty and for which he is now to be sentenced,

20   crimes going back, as your Honor has already noted, to 2017

21   and 2018 when Herb Wright was 21 and 22 years old.

22         In the last six and seven years, Herb has changed

23   and matured in significant ways.  He is now a father.  He's a

24   family man.  He's the father of three young children, whom he

25   supports not just with money and a place to live, but by all

1    accounts with great love, with great affection, with a great

2    devotion to his role as a father and as a partner with Taina

3    Williams, who has addressed the Court in her letter.

4        Herb has, in simple language, grown up a great deal

5    in the last six and seven years.  He's a different person.

6    He's a different human being.  As has been noted, but I want

7    to repeat some of this again because to me it is so

8    remarkable, Herb's life has been, through childhood and young

9    adulthood, remarkable by any definition of that term.

10        He grew up in the south side of Chicago, the

11    toughest part of town, and he grew up in the toughest part of

12    the toughest part of town, in a part of town called "Terror

13    Town," marked everywhere by drugs and by violence.  He and

14    his family lived on the first floor of an apartment building.

15    He was schooled very early in his life:  When you hear a loud

16    noise, you fall to the floor, you put your hands out.  It is

17    likely to be a drive-by shooting and you have to protect

18    yourself in this way.

19        He saw, as Mr. Breslow has mentioned, his first

20    murder, a few feet away from him, when he was nine years old.

21    He went to school the next day because that's what you do in

22    Terror Town.  By the time he was 17, 17 of his closest

23    friends and relatives had been murdered.  From at least the

24    age of 14, Herb feared for his life and that fear has never

25    left him.  He himself was shot in a drive-by shooting, a

1    random Terror Town drive-by shooting.

2         These incredible events coming at a very early age

3    have made him fearful, even today, and he feels in danger and

4    vulnerable, especially at night and especially in large

5    cities, unless he is accompanied by some form of security

6    assistance.

7         He has developed, as the materials have informed the

8    Court, a chronic form of post-traumatic stress disorder.

9    That was a long time coming in diagnosis and it was a long

10   time coming in treatment.  Because in Terror Town, no one

11   talked about mental health, no one talked about mental

12   illness.

13        And so he turned to drugs.  He turned to drugs at an

14   early age, as you are aware from reading the memorandum.

15   With great treatment and a great deal of determination and

16   hard work on his part, he removed himself from opiate

17   addiction in 2018 and has not returned to opiate use and

18   addiction since then.

19        In the letter, which I believe is Exhibit 1 in the

20   sentencing memorandum from Kyla Dannelke, we are

21   structured -- instructed as to the impact of post-traumatic

22   stress disorder on the decision-making process of everyone

23   but young people in particular.  Ms. Dannelke, with whom Herb

24   has had a relationship for some time now, has also addressed

25   the issue of Herb's commitment to healing himself, as well as

his passionate desire to bring mental health resources to the
community in which he grew up.

He has in many significant ways committed himself
both to ensuring that young people in the inner city get the
kind of mental health treatment they need, and, in perhaps
equally important, he has done everything that he knows how
to do and is committed to doing more in the future to
destigmatizing mental illness in places like Terror Town.

To this end, he launched his flagship program called
"Swervin' Through Stress," a program that has recently
achieved 501(c) charity status.  That was an idea that came
to him and to others in 2019.  Swervin' Through Stress got
off the drawing board in early 2020.  It has attempted and is
succeeding in bringing therapeutic resources to people who
would not have them otherwise.  Swervin' has engaged with
hundreds of women and many hundreds of young people in the
inner city who have been affected by violence.

The memo also makes clear that Herb is dedicated to
food insecurity, primarily through a program called Dion's
Chicago Dream.  And in 2020 he put money, he put his fame, he
put his impact in the community.  As an important and famous
person in play, turning his former elementary school into
what is now the Overton Center of Excellence, which is
devoted to encouraging and inspiring young people to pursue
their dreams in the creative arts.

1           In the addition to the great commitment that he has

2   shown in his community, he has shown a great commitment to

3   his family as well.  Since the date of these two offenses in

4   2017 and 2018, he has become the father of five (sic) small

5   children:  One is five, one is two, one is one-year-old.

6   These children are not only supported by him financially but

7   in every other emotional and fatherly way as well.

8           Others have attributed to that and, your Honor, I

9   have seen it with my own eyes and I have heard it with my own

10  ears.  He is in a committed relationship with Taina Williams,

11  who is here today, along with Herb's mother and father.  She

12  has written, I think eloquently, about their relationship,

13  about a relationship built on love and commitment.  She says

14  Herb's a good father, he's a good partner, he's a great

15  listener.  He puts nothing but love and affection out there

16  constantly when he is with his children.  Herb's mother and

17  father have also written eloquently to this effect and the

18  kind of person that Herb is really deep down inside.

19          The Court is well aware and we've already addressed

20  it to a certain extent that this case carries financial

21  obligations for forfeiture and for restitution.  Forfeiture

22  and restitution have been paid to the amount of $280,746,

23  280,746.  I know Mr. Wright makes money.  He's a rapper with

24  income that comes in.  But $280,000, more than a quarter of a

25  million dollars, paid is nothing to ignore.

1          Herb wanted to pay this amount of money, not because

2    he was required to and it would make him look better with the

3    court, he wanted to pay the money because he really regrets

4    what he did and he wants to do everything that he possibly

5    can to make things right, to make things better.  That's the

6    mission that he's on now in the time that he has before him.

7          We have, in fact, argued that he was a minor

8    participant in the offense, that he played a minor role for

9    the reasons that Mr. Breslow has himself argued.  He had

10   limited, if any, contact with other members of the

11   conspiracy.  He never bought or transferred or sold any of

12   the illicit information which was used by Antonio Strong in

13   order to purchase goods and services that Herb was not

14   entitled to and for which he has pled guilty in this case.

15         I do not believe, your Honor, that the Government

16   will disagree with me when I say that Herb Wright is the

17   least culpable, the very least culpable, of all of the

18   defendants in this case.  I wrote the words down.  I

19   appreciate Mr. Breslow's candor.  "He had a limited role,"

20   he's told the Court, "in the conspiracy."  That's an honest

21   statement.  And I appreciate it.  He's also told the Court,

22   "he is not likely to commit further frauds."  I would say

23   exactly the same thing.

24         Pursuant to the analysis under 3553, your Honor,

25   considering all that you have heard, a sentence of probation

1   is the sentence that best serves the objectives at

2   sentencing.  I'm almost --

3           THE COURT:  In applying the minimal participant

4   analysis, although the Government has been very generous to

5   the defense position in their oral recitation, very favorable

6   to the defense position they've taken in oral argument, but

7   in their written materials they're asking for a year.

8           ATTORNEY LAWSON:  Yes.

9           THE COURT:  Get credit, that means eight or nine

10  months.  The Government has pointed out in their written

11  materials, not in their oral advocacy today, but in their

12  written materials, that it seems that Mr. Wright benefitted

13  most -- who benefitted more than Mr. Wright from the amount

14  that is attributed to him, you know, the 150 -- he benefitted

15  the most, it seems to me, based upon what the Government has

16  said.  And he benefitted most because it is clear -- and I

17  know you don't dispute this and Mr. Wright doesn't dispute

18  this -- but he requested these services or vendors

19  provide those services.  And then he used those services as a

20  jump off point for his social media presence and his success

21  in his business by filming those things, such as a jet or

22  jets and the villa in music videos and promoting himself,

23  very, very successfully, in a very smart way.

24           So I mean, it seems that for application of a

25  minimal participant, you analyze how much you might have

1  benefited from what you realize by the illegality, and it

2  seems almost inescapable that he benefitted the most.

3            ATTORNEY LAWSON:  I don't want to minimize the

4  Court's point, but let me respond in this way:  To begin

5  with, with a sentence of a year and a day, as I understand

6  it, Mr. Wright will only serve 85 percent of that sentence

7  rather than 100 percent of that sentence, which would reduce

8  that sentence to about, I believe, ten months, which is a

9  substantial amount of time --

10           THE COURT:  No doubt.  Ten months is --

11           ATTORNEY LAWSON:  -- and a substantial amount of

12 time away from his family.

13           THE COURT:  No doubt.  None of us in this courtroom

14 want to do ten months.  We don't want to do a day.

15           ATTORNEY LAWSON:  And while the amount of

16 Mr. Wright's fraud may be small in the context of the greater

17 conspiracy, I understand the Court's point that he benefitted

18 from it.  The amount of that benefit has to be somewhat

19 speculative.  I would concede that there was some benefit

20 from the fraud.  There was a video taken using the Jamaica

21 villa.  But Mr. Wright has pled guilty to these things --

22           THE COURT:  Well, there was -- when you look at the

23 government material and the plea agreement, there was -- yes,

24 the video and the benefits to his business, there was an

25 interview he gave with a music magazine in which he talked

1    about the villa, the villa that was paid for fraudulently.

2              ATTORNEY LAWSON:  Yes, your Honor.

3              THE COURT:  And he is quoted in the plea agreement

4    facts that were agreed to by the parties that he was destined

5    for this, "Something that was destined for me in my life took

6    me along a path to Jamaica vacationing in a million dollar

7    estate."  I mean, this is in a -- he's being published in a

8    trade magazine that's I'm sure very helpful and is very

9    impressive that they would want him to do that interview.

10   But I mean, that is a big benefit.  And that's quite a thing

11   to say, you were destined to be in multimillion dollar

12   Jamaica vacation estate based upon money that was stolen.

13             ATTORNEY LAWSON:  He became successful, your Honor,

14   at about the age of 16.  He's had great confidence in

15   himself.  I would add to the Court's comment, and I

16   appreciate the comment from the Court, that he's also a

17   person of tremendous talent and charisma and that his talent

18   and charisma have also -- and largely been the factors that

19   have driven his success.  He feels very sorry and very

20   remorseful, your Honor, for what he did when he was a much

21   younger person.

22             THE COURT:  Okay.

23             ATTORNEY LAWSON:  He's literally grown up over the

24   last six and seven years.

25             THE COURT:  All right.  Well, let me further

1    add -- I just want to say -- and I feel that the Court is in

2    a position to do this since I'm balancing the fairness of

3    both the defense side and the Government's prosecution,

4    although it wasn't -- although, again, the tone of the oral

5    presentation for the Government was very defense-oriented.

6            It seems that the written pleadings show

7    Mr. Wright's knowledge, clearly he knew what was going on,

8    clearly he knew that the people he was working with to

9    promote his business, how they were getting what he was

10   asking for services, whether it be hotels, cars, luxury cars,

11   jets, villas, things like that.  And the reason why I'm

12   running down this list is because when you look at minimal

13   participant, these are the factors that you consider.  So

14   that's why I'm doing the analysis.

15           He wasn't taking instructions from anyone.

16   Oftentimes a minimal participant, if they get the credit for

17   a minimal participant, is kind of given their cue in

18   ordering -- other people are ordering what that person to do

19   as a minimal participant.  Mr. Wright certainly was not an

20   underling.  As you said, he's extremely accomplished,

21   extremely intelligent.  And so there's no way, shape, or form

22   was he an underling taking directions.

23           The Government points out multiple times that he

24   actually involved himself.  The Government writes in their

25   memorandum that it was Mr. Wright actually had direct

1    communication with a car rental business to further the

2    conspiracy.  And there's a recording of a phone call where he

3    tells Mr. Strong that he's going to call this car rental

4    place right back.  Mr. Strong had told Mr. Wright, make sure

5    you know that I'm going -- this is the fake name that I'm

6    using this time, so use my fake name.  Mr. Wright indicates

7    yes, essentially -- I'm paraphrasing -- that he's

8    contacting -- he's contacting them.

9          And Mr. Wright, as the Government pointed out on

10   page 7 of the memorandum, Mr. Wright acknowledged that -- and

11   it is in quotes.  It must be in a phone call that was -- or a

12   text message, I'm sorry, a text message -- that Mr. Wright

13   indicated to Mr. Strong that, I'm going to keep paying

14   you -- and I'm paraphrasing -- if you keep getting them.

15   Meaning the cars.

16         So Mr. Wright knows he's paying for things.  He

17   doesn't really have to get his hands dirty because he has

18   other people doing things, but that's the nature of the

19   conspiracy.  You and Mr. Wright understood that when

20   Mr. Wright pled guilty to the conspiracy.

21         ATTORNEY LAWSON:  Yes, of course.

22         THE COURT:  So these are the considerations for

23   minimal participant.  So I want to give fair consideration to

24   your request for treatment as a minimal participant, but that

25   means I have to raise these issues for you to respond to

1   because they're the considerations for such application.

2          ATTORNEY LAWSON:  It is not the only reason, your

3   Honor, for the request for downward departure.

4          THE COURT:  No, it is not the only reason.  But it

5   is for the minimal participant.

6          ATTORNEY LAWSON:  I understand that, your Honor.  It

7   is simply our way of saying that, after a review of many,

8   many, many thousands of documents, we would simply join hands

9   with the Government today and say he is the most limited of

10  all of the co-conspirators.  He is not likely to commit these

11  offenses again in the future.  And he the most -- or the

12  least culpable of everyone who will ultimately come before

13  your court in this case.  And, therefore, a downward

14  departure, again, on the analysis of 3553, as outlined in our

15  sentencing memorandum, is --

16         THE COURT:  Is that because he could be viewed as

17  criminally less liable?  Or could it be because of his

18  position, he was only -- he was making requests for other

19  people to do things that he didn't have to undertake himself

20  to make him -- to kind of put him deeper in the criminality?

21         ATTORNEY LAWSON:  I understand, your Honor.  The

22  point I'm simply making is that he's the least culpable.  In

23  the words of the Government, played a limited role in the

24  conspiracy.  That's all that I'm trying to argue.  And that

25  he deserves a sentence of compassion and probation under the

1    analysis of 3553.

2            THE COURT:  All right.

3            ATTORNEY LAWSON:  If I may have just a few more

4    minutes, your Honor.

5            THE COURT:  Oh, sure.

6            ATTORNEY LAWSON:  I am almost at the end.  And I

7    appreciate the Court's patience.

8            THE COURT:  Absolutely no rush.  Take -- go right

9    ahead.

10            ATTORNEY LAWSON:  I've spoken a long time and I know

11    that.

12            Let me end by simply saying that I have come to know

13    personally Mr. Wright over the last two and a half years.

14    He's not a perfect person, but he is a fine young man.  And I

15    don't say that because it is written in my notes or because

16    he hired me to do that.  I say it because I believe it is

17    true.  He's a fine young man.

18            He is passionately committed to raising his children

19    well.  And he is passionately committed to helping young

20    people who have lived in horrendous circumstances.  As I have

21    said several times, he's devoted to his family and words

22    cannot even begin to express the difficulty he articulates

23    with me that his five-year-old son might be a young man some

24    day with the memory of having seen Herb in prison or that his

25    children, who are two and one years old and dearly loved,

1    would be without his guiding hand over any period of time.

2              Without reservation, your Honor, I commend him to

3    you.  And I do ask for your mercy.  He is a young man worth

4    saving.  And so I ask for a sentence of probation with

5    whatever attendant consequences your Honor believes are

6    appropriate in this case.  Thank you.

7              THE COURT:  Okay.  Thank you very much.

8              All right.  Mr. Wright, as I told you, I'm happy to

9    give you as much time as you want to address the Court, if

10   you want to.  As I said, you don't have to say anything if

11   you don't want to.

12             THE DEFENDANT:  Yes, your Honor, I would like to

13   address the Court.

14             THE COURT:  Go right ahead.

15             THE DEFENDANT:  May I stand?

16             THE COURT:  Whatever you're more comfortable with.

17             THE DEFENDANT:  Your Honor, first and foremost, I

18   would like to give my most sincere apology to the Court.  I

19   want to say I'm sorry to the victims and everyone that was

20   affected by my actions and wrongdoings.  And last but not

21   least, I would like to apologize to my family who are also

22   affected and who have supported me through this time, which

23   has been one of my hardest times in life.

24             And I want to ask for your mercy and the Court's

25   mercy to, you know, to contest to the fact that I have

1    changed during these times.  I have -- I am not, you know,

2    the same person that I was in 2017 and '18, given the fact

3    that I am a father now and I am the leader of my household

4    and a stellar person in the community, that I want to

5    continue to, you know, give my contribution to the community

6    and to, you know, of course my family and my children, being

7    the positive role model that I am.

8         And I accept full accountability for these actions

9    that I've committed.  And once again, that I'm just truly

10   sorry.  And I want to put this part of my life behind me.

11   And I want to continue to, you know, show the world and show

12   and prove to everyone around me that I'm just trying to be

13   the best man and the best version of Herbert Wright, myself,

14   that I can be.  And once again, with your mercy, to allow me

15   to continue to be free and to grow and to keep learning from

16   the situations and the things that I've put myself into.  It

17   will be much appreciated.  And, you know, once again, I

18   just --

19        THE COURT:  What was going on -- what was going

20   on -- kind of give me a snapshot of 2017, 2018, for you when

21   you made these decisions.  I mean, it is impossible to look

22   at you and know about you.  And you've had a very -- you've

23   had a very hard upbringing, but you're obviously extremely

24   accomplished and intelligent.  So in 2017 and '18, what is

25   going on with you that you made the decisions to use -- to do

1    this?

2            THE DEFENDANT:  Okay.  Well, so 2017, '18 I was

3    about 21, 20, 21 years old and just trying to achieve things

4    in my life that I didn't think were possible, your Honor.

5    You know, to -- and I was benefitted by these wrongdoings

6    that I committed and to just, you know, change my situation

7    and to get myself and, you know, my family into a better

8    situations.  I was --

9            THE COURT:  But why did you need -- why did you need

10   to steal and to get money this way when you were already on

11   your way, it seems?

12           THE DEFENDANT:  Honestly, your Honor, I have no

13   excuses for the wrongdoings.  You know, I just was -- for

14   lack of a better term, I was just a dumb kid, you know, that

15   didn't really understand the effect that I've caused on other

16   people and the hurt that I've caused to families and these

17   businesses.  And, you know, I have absolutely no excuses.

18   And I hold myself fully accountable for the things that I

19   have done.  And I didn't mean to hurt anyone in the process.

20           I was just, you know, young, being an artist and

21   just trying to, you know -- I wouldn't say I was trying to

22   further my career by, you know, intentionally hurting others,

23   but that's the nature of the case and, you know, what has

24   happened.  So once again, I just want to say I apologize.

25   And in 2017, I -- I'm grateful to say -- to be here to be

1    able to say that I am not that person anymore and that I have

2    learned empathy and I have learned patience within this

3    entire process.  And I just, like I said, want to, you know,

4    put this chapter of my life behind me.  So 2017, '18, if I

5    could fast forward now and, you know, had to spoke to my

6    younger self, I would have told myself to, you know, just be

7    patient.

8            THE COURT:  And I want to ask you that -- I've

9    looked at these impact statements.  So I have impact

10    statements from people who ran small businesses, talking

11    about how they lost sleep over this, they were embarrassed by

12    this.  This affected them.  This affected their families.

13    One business had to let employees go because the business had

14    to cover the costs of what they lost because of the fraud.  I

15    mean, these are real impacts on the lives of these vendors,

16    these businesses, so as Mr. Breslow said, were mostly smaller

17    businesses.

18            So have you considered -- have you considered

19    the -- well, I know you've considered the impact on them.

20    But -- and I wouldn't have expected you to try to make any

21    type of apology directly to the victims.  But have you

22    considered or talked to your attorney about trying to make

23    some apology to these individuals?  In other words, in a a

24    restorative justice type of way.  I don't know if you're

25    familiar with that type of programming but --

1              THE DEFENDANT:  Yes, your Honor.

2              THE COURT:  All right.

3              THE DEFENDANT:  I have spoken with my attorney.  And

4    I'm not opposed to anything that will show my empathy that I

5    do have to the people that were affected.  And me being fully

6    apologetic and with me having influence and, you know, in the

7    world and all over just to show the generation under me that,

8    you know -- it is not okay to commit any crimes of any

9    nature, but not to, you know, take advantage of others or

10   other people's hard work for the benefit of one's self.

11             So to answer your question, yes, that is something

12   that I'm very interested in doing and just accepting full

13   accountability for my role that I played in these crimes and,

14   you know, to make sure that of course -- I would never be in

15   this position again, of course, but to show, like I said, the

16   generation under me that, you know, there is a way to do

17   better and to not take the easy route, for lack of a better

18   term, to get the things that you desire in life, your Honor.

19             THE COURT:  All right.  And I'm sure your lawyer is

20   going to tell you this, but I'll tell you this as well:  My

21   comments are in no way intended to make you reach out -- you

22   should not make any attempt to reach out to any victim in

23   this case without discussing it with your attorney and

24   getting approval from the court.  So there can never be a

25   contact with a victim.  But if your attorney, in consultation

1    with the U.S. Attorney's Office, thought that it is something

2    that you might want to pursue, they could present that to the

3    Court and the Court, if the U.S. Attorney's Office agreed

4    with it, could authorize something like that.  Do you

5    understand that?

6             THE DEFENDANT:  Yes, absolutely.

7             THE COURT:  All right.

8             THE DEFENDANT:  And one last thing, outside of my

9    situation, if there was anything that I could do to just

10   bring awareness to these type of crimes and, you know, how

11   they do affect small businesses and families personally,

12   anything that I can do to turn that narrative around, I'm not

13   opposed to it, your Honor.

14            THE COURT:  So you're telling me that you just

15   didn't realize that someone was losing money, or did you

16   think some corporate place was losing money and they were not

17   even going to notice it because it is just so small?

18            THE DEFENDANT:  Honestly, your Honor, yes.

19            THE COURT:  That's what you thought?

20            THE DEFENDANT:  I honestly didn't think to the

21   nature of me actually ruining families, your Honor, or

22   affecting, you know, families.

23            THE COURT:  Okay.  All right.  Thank you.  Is there

24   anything else?

25            THE DEFENDANT:  No.  Thank you, your Honor.

1          THE COURT:  All right.  Attorney Lawson, is there

2     anything that you wanted to comment on?

3          ATTORNEY LAWSON:  No, your Honor.

4          THE COURT:  No?

5          ATTORNEY LAWSON:  Other than that, if the Court were

6     to make some sort of apology a condition of release on

7     probation, we would be delighted to --

8          THE COURT:  Well, I mean, I don't want to push that

9     or force that.  But I wanted to put the idea, you know,

10    restorative justice is a type of approach to sentencing and

11    rehabilitation and making amends for criminal actions.  But

12    that's a process that would have to be agreed to with the

13    U.S. Attorney's Office because of course no victim should in

14    any way -- and you know this -- be contacted and does not

15    have to be involved in any such type of efforts.  But I'm

16    just -- I'm trying to put a seed out there.  If you consider

17    that seed planted, then you know where to go with it.

18         ATTORNEY LAWSON:  Heard and understood, your Honor.

19    Thank you.

20         THE COURT:  Could I see probation, please.

21         (Discussion off the record)

22         THE COURT:  All right.  In consideration of the

23    3553(a) factors, purposes include a need for a sentence to

24    reflect the seriousness of the crime and to promote respect

25    for the law, so the Court is fully considering those items,

1    to provide just punishment for the offense, I have also -- am

2    considering that, to promote rehabilitation, both

3    specific -- well, for the Defendant, for Mr. Wright, clearly

4    rehabilitation is completely underway, and to deter future

5    criminal conduct, that is of Mr. Wright personally and

6    general deterrence.  It seems to me that the specific

7    deterrence as to Mr. Wright, as far as I can tell, there is a

8    very low or no likelihood of reoffending.  I'm just not

9    seeing that.

10         But there's this general deterrence issue.  And the

11   general deterrence concept is obvious.  You can't gain money

12   this way.  You can't harm other people by scamming and

13   stealing money.  That's the general deterrent.  Now, of

14   course, general deterrence is one consideration of a lot of

15   factors.  I am also considering the JSIN numbers.  And those

16   JSIN numbers indicate that for individuals that were

17   incarcerated, the average and the mean, were eight months and

18   six months respectively.  So we know that seems to be the

19   average.

20         And we go through this analysis -- and I'm just

21   saying this for the record and just for transparency so the

22   parties know what I'm thinking about when I'm trying to

23   formulate a fair sentence.  We go through these numbers in

24   the analysis and one of the things that this Court is

25   constantly aware of is disparity of sentencing.  So I've

discussed with the probation department all financial types

of crimes that I can remember handling in this court to

compare loss amounts and guideline ranges and criminal

histories and circumstances -- and of course there's never

one case that is exactly like the other -- but to avoid any

significant disparity and I should say unjustified disparity

of sentencing.  So I want to stay consistent from case to

case.

That's what I look at the JSIN numbers for as well,

to see across the country, given a pool of individuals

similarly-situated, what was the sentence.  So the JSIN

numbers in one way do not look entirely favorable for

Mr. Wright's position or what -- he's asking for probation.

But on the other hand, you look at the JSIN numbers and the

JSIN numbers surveyed 1,088 defendants who were charged

similarly.  And where they got their average and median

number were from the 683 individuals who received prison

sentences.  That means out of all of those individuals

surveyed, out of the 1,000 or some -- the 1,000-some-odd

defendants, it looks like 405 of them received

nonincarceration sentences.  I mean, the JSIN numbers don't

tell me that in black and white, but they tell me, this is

how many were charged, here's the sentences on anyone that

went to prison, here are the sentence ranges, and there

leaves a gap of 405 people that we're not telling you what

1    their sentence was because it looked like a nonincarceration

2    sentence.

3            This is the exercise I'm going through.  And so, you

4    know, sentencing any person for any offense is a difficult

5    process.  And these are the considerations.  So I can easily

6    see an incarceration sentence, not to the number that the

7    Government is asking, but for something below what the

8    Government is asking.  You know, it easily fits into the

9    facts of this case.

10           Perhaps the most important guiding factor for

11   sentencing is to impose a sentence that is sufficient but not

12   greater than necessary.  So it leaves me to think about what

13   is the -- what is being accomplished by the incarceration

14   sentence that I'm considering and is that greater than what

15   is necessary to accomplish the goals of sentencing, which

16   include respect for the law, recognition of the seriousness

17   of the offense, rehabilitation.  I have explained them.

18           All right.  All right.  So in this case, I think

19   that -- I think that my position regarding the

20   appropriateness of the sentence has evolved during today's

21   hearing, discussion with probation, hearing the

22   U.S. Attorney's articulation, and listening to the defense

23   argument from Attorney Lawson, and the statement of

24   Mr. Wright.

25           I'm thinking about the age of the case.  This is a

1    very -- this is an old case.  And that's not any suggestion

2    at all that the Government dragged its feet.  Absolutely not.

3    I mean, there was COVID during this case and there was an

4    explanation of Mr. Breslow as to the complexity of this type

5    of investigation.  The point is, there's a long period of

6    time for Mr. Wright to be out there and to be doing positive

7    things.  And it seems like he used that time in an

8    extraordinarily positive way.

9         I'm considering Mr. Wright's childhood.  I'm also

10   considering the very young age at which he made these bad

11   decisions regarding this fraudulent activity.  You know, it

12   is a young age that, depending on what study you read and

13   when the study is done, talk about when a young person's

14   ability to think clearly and make good rational thoughts is

15   fully developed, and certainly that is affected by one's

16   upbringing and environment.

17        And there was emotional health issues too.  There

18   was emotional health issues that, it is clear to me looking

19   at the history of Mr. Wright, that were affecting his ability

20   to make clear decisions.  It seems absolutely clear

21   Mr. Wright is -- I clearly believe him when he says he just

22   didn't even think about the effect on others, just didn't

23   even think about it.  You know, figures somebody is running a

24   credit card, some company is going to write this off, and

25   didn't realize and didn't care at that young age, didn't have

1    the capacity to really understand the effect of the

2    criminality on others.

3            But I find that there's a level of extraordinary

4    acceptance here, where Mr. Wright does understand the effect

5    that this has had on other people.  And that during that

6    period of time, as I said, the case is so old, he has been

7    out there, Mr. Wright has demonstrated a commitment to his

8    community and been involved in charitable acts, as is

9    represented through the letters of support that were very

10   impressive and clearly recognized by the Government as well.

11           In consideration also of what can be viewed as minor

12   participation -- although there's two sides to that argument,

13   as I've tried to articulate through my questions to you,

14   Attorney Lawson, as to how minimal his participation was.  I

15   certainly do recognize that in the bigger scheme of this

16   fraud, a very low number is attributable to the conspiracy

17   side with Mr. Wright in a much larger, deeper -- deeper

18   fraudulent activity is involved with the other part of the

19   Government investigation.  So I recognize that.

20           I'm at the point of having a very difficult time

21   deciding what is sufficient but greater than necessary.  But

22   when I'm at that point of having such a difficult time

23   deciding the fairness of a sentence, considering everything

24   as a whole and the things that I've talked about, if I'm

25   having that difficult of a time, then the benefit of that

1    difficulty goes to the person charged in front of me.  And

2    this certainly happens with sentencing individuals.  And so

3    I'm going to give that benefit to Mr. Wright.

4          I, again, would -- I don't know how receptive the

5    U.S. Attorney's Office is or how appropriate it would be, but

6    I know that Attorney Breslow and also very much know that

7    Attorney Shukla is very informed about restorative justice

8    types of programs.  And this may be something appropriate.

9    Maybe not.  But it may be something appropriate to think

10   about.

11         So I'm going to impose a probationary sentence.

12   Probationary sentence will be for a period of three years,

13   concurrent on each charge.  There will be a fine.  As the

14   Government points out, there needs to be a fine, unless it is

15   demonstrated an inability to pay one.  The Government asks

16   for -- and I certainly understand the Government's request

17   for a $55,000 fine.  I'm not going to impose $55,000 fine.

18   I'm going to impose a $5,500 fine, which is at the low end.

19         However, I'm not making it a condition of probation,

20   but I'm strongly suggesting that at some point I would like

21   probation to report to me that you've made a contribution to

22   some charitable or community organization in an amount of

23   money that would bring the total up to the amount of a fine

24   that the Government asked for.

25         All right.  The conditions -- what's the special

1    assessment?  200?

2           PROBATION OFFICER:  200.

3           THE COURT:  So $200 special assessment is due and

4    payable.  I think that is already taken care of.  The fine I

5    have addressed.  The conditions are you must not commit

6    another federal, state, or local crime.  You must not possess

7    or use a controlled substance.  You must subject yourself to

8    random screening for use of controlled substances.

9           And this is the process that I think is already

10   going on.  This is essentially what's been going on during

11   your release anyway.  But that will continue.  You will be

12   subject to random testing, as deemed appropriate by the

13   probation department.  And you will be recommended to enroll

14   in and successfully complete any mental health programming

15   and/or any drug use programming that the probation department

16   deems appropriate.

17          And, again, this program -- I've been thinking about

18   this.  This programming has been going on during the entire

19   time that Mr. Wright has been on release.  And while his

20   participation has not been perfect or the accomplishments has

21   not been perfect, frankly, one wouldn't expect them to be,

22   but they've been -- they've been very promising.

23          All right.  There shall be no contact with any

24   victims unless authorized by the court.  And that no contact

25   is through third parties, electronically, directly,

1    indirectly unless it is authorized by the court.  You shall

2    not --

3              Does probation want the financial --

4              PROBATION OFFICER:  No.  Based on the fact that

5    everything has already been paid, with the exception of the

6    fine, but I'm assuming that that will be paid within the next

7    30 days.

8              THE COURT:  Is there any other conditions probation

9    needs?

10             PROBATION OFFICER:  No, no conditions, just the

11   right --

12             THE COURT:  So any other conditions?

13             PROBATION OFFICER:  No, sir.

14             THE COURT:  Is there any other conditions that the

15   Government would like?

16             ATTORNEY BRESLOW:  I just want to make sure, are the

17   standard conditions applicable?

18             THE COURT:  Oh, absolutely.  All of the standard

19   conditions apply regarding no commission of federal, state,

20   local crimes.  No possession of controlled substances, random

21   testing, yes.

22             ATTORNEY BRESLOW:  Right.  No firearms.

23             THE COURT:  Absolutely no firearms.  No

24   possession -- no illegal possession of any firearms, unless

25   it is -- unless he is deemed by the state he is living in to

1    be able to possess.  But he's convicted of a felony, which is

2    going to make him not -- a person who cannot be licensed to

3    carry.

4            ATTORNEY BRESLOW:  Right.  I just want that to

5    be -- I think you've done what I would have asked you to do,

6    which is to inform Mr. Wright that as a convicted felon, it

7    is a separate federal crime for him to possess any firearm

8    that's traveled in interstate commerce or even a single

9    bullet that has traveled in interstate commerce.  And the

10   only reason I want to emphasize that, your Honor, is there

11   has been a history of firearms possession by Mr. Wright,

12   including a case that I think has been dismissed while he was

13   on pretrial release in this case.  So I think between what

14   you've said and what I've said, Mr. Wright is on notice.

15           THE COURT:  All right.  Well, he has one case where

16   the charges were dismissed, so I don't consider that at all.

17   But he does have a prior conviction.  Clearly, no possession

18   of firearms, end of story.  That's a condition.

19           ATTORNEY LAWSON:  That's understood.  But just to

20   correct the record, that matter is still pending with the

21   expectation --

22           THE COURT:  Thank you for that.

23           ATTORNEY LAWSON:  -- it is to be dismissed.

24           THE COURT:  I appreciate that correction.  I'm

25   sorry, Mr. Breslow.  I misread the report on that.

1          ATTORNEY BRESLOW:  That's okay.

2          THE COURT:  All right.  Anything else,

3    conditionwise, from the defense?

4          ATTORNEY LAWSON:  No, your Honor.

5          THE COURT:  All right.  Mr. Wright, do you

6    understand that you have the right -- your right to appeal is

7    significantly limited because you entered into the plea

8    agreement in which you gave up a lot of your appellate

9    rights, but you do have the right to appeal this sentence, if

10   you want to, and you can discuss that with your attorney.  Do

11   you understand?

12         THE DEFENDANT:  Yes, your Honor.

13         THE COURT:  Okay.  All right.  So anything else?

14         ATTORNEY BRESLOW:  For the Government there is, your

15   Honor.

16         THE COURT:  Okay.

17         ATTORNEY BRESLOW:  So the plea agreement required us

18   to dismiss Counts 8 and 12.  We're doing that now orally.

19         THE COURT:  All right.

20         ATTORNEY BRESLOW:  We're seeking to dismiss -- we're

21   moving to --

22         THE COURT:  The Court will allow the dismissal of

23   that based on the oral motion.  And to the Government, I

24   think I've signed all of the orders other than the

25   forfeiture.  So I'll get that signed and electronically

 1    delivered.

 2              ATTORNEY BRESLOW:  Okay.

 3              THE COURT:  All right.  I think we're all set.

 4    Thank you.

 5              ATTORNEY BRESLOW:  Good afternoon, your Honor.

 6              ATTORNEY LAWSON:  Thank you.

 7              THE CLERK:  All rise.

 8        (Whereupon, the proceedings were concluded at 3:39 p.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

49

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4              I, Leigh B. Gershowitz, Registered Merit

5    Reporter and Certified Realtime Reporter, in and for the

6    United States District Court for the District of

7    Massachusetts, do hereby certify that the foregoing

8    transcript is a true and correct transcript of the

9    stenographically-reported proceedings held in the

10   above-entitled matter, to the best of my knowledge and

11   ability.

12

13

14                              /s/ Leigh B. Gershowitz_____

15                              Leigh B. Gershowitz, RMR, CRR

16

17

18

19

20

21

22

23

24

25